# Thomas H. Beavers, Jr.

v.

# Commonwealth of Virginia

Record Nos. 921544 and 921545

February 26, 1993

Present: All the Justices

*Leslie P. Smith (Timothy G. Clancy; Cumming, Hatchett, Moschel & Patrick,* on brief), for appellant.

*Katherine B. Toone, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

JUSTICE LACY delivered the opinion of the Court.

In this appeal we review the capital murder conviction and death penalty imposed upon Thomas H. Beavers, Jr., along with his convictions for rape, grand larceny, and arson arising from the same series of events.

## I. Proceedings

Beavers was tried upon indictments charging capital murder, rape, grand larceny, and arson. Code §§ 18.2-31, -61, -95, and-81. At the conclusion of the first stage of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, the jury convicted Beavers of all offenses. The jury fixed his punishment as follows: life imprisonment for rape; ten years imprisonment for grand larceny; and eight years imprisonment for arson.

At the penalty phase of the capital murder trial, the jury heard evidence on aggravating and mitigating circumstances and fixed Beavers's punishment for capital murder at death. After the trial court considered the probation officer's report and conducted a sentencing hearing, it imposed all the sentences fixed by the jury.

We have consolidated Beavers's appeal of the capital murder conviction in Record No. 921544 with the automatic review of his death sentence to which he is entitled, Code §§ 17-110.1(A) and (F), and have given them priority on our docket, Code § 17-110.2. We have also certified Beavers's appeal of his non-capital murder convictions, Record No. 921545, from the Court of Appeals and have consolidated the two records for our consideration.

## II. The Evidence

We review the evidence in the light most favorable to the Commonwealth, the prevailing party below.

On the night of May 1, 1990, Beavers broke into the house of his neighbor, Marguerite Lowery, a 60-year-old widow who lived alone. She was awakened by a noise and, as she walked through the house, Beavers grabbed her, placed his hand over her mouth, and forced her back into her bedroom. Mrs. Lowery became hysterical and began to scream.

She continued to scream after Beavers forced her down onto the bed and ordered her to be quiet. After wrestling with her for about two minutes, Beavers covered her face with a pillow. Mrs. Lowery began kicking, and Beavers again ordered her to be quiet. When she quieted down, Beavers removed the pillow. Mrs. Lowery again began to scream and struggled with Beavers. During the struggle, her clothes were ripped. Beavers tore off her clothes, ripping her nightgown completely down the side seams and across the right shoulder in front, and ripping the entire front of her underpants.

Beavers was nineteen years old, six feet tall, and weighed 205 pounds at the time of the attack. Mrs. Lowery was five feet, five and one-half inches tall, and weighed 175 pounds.

Beavers then raped Mrs. Lowery and when, once more, she started to scream, Beavers held a pillow over her face until she stopped screaming. When he removed the pillow, Mrs. Lowery made a few gasping noises, then stopped moving. According to the testimony of Dr. Faruk Presswalla, the deputy chief medical examiner for the region, Mrs. Lowery died as a result of cardiac arrhythmia caused by lack of oxygen.

After killing Mrs. Lowery, Beavers placed an open Bible on her chest, took a powdered kitchen cleanser from the bathroom and scattered it over the room and her body, and spread toothpaste on Mrs. Lowery's vagina and breasts. Beavers removed four rings from Mrs. Lowery's dresser, scattered pills around the kitchen, partially burned a photograph of Mrs. Lowery on the stove, and left the house in complete disarray, with one of the gas stove's burners still burning. When Beavers left Mrs. Lowery's house, he stole her car. After parking the car in a public place, Beavers set it afire by lighting newspapers on the interior floor.

A Hampton police officer found the burning car and traced it to Mrs. Lowery. Officer Banwell of the Hampton police department went to Mrs. Lowery's house in the early morning hours of May 2, 1990. Receiving no answer to his knock, he left. He returned to the home later that morning and, still receiving no answer, entered the home through a side door that was slightly ajar. Entering through the kitchen, the officer found the stove burner on, the burnt photograph, and the house in general disarray. He found Mrs. Lowery's nude body lying on the floor near her bed.

Approximately one year later, on May 14, 1991, and with the Lowery murder still unsolved, Beavers broke into the house of his next door neighbor, 50-year-old Shirley Hodges. He was still in the house when Mrs. Hodges returned home. Beavers grabbed her, covered her mouth with his hand, and ordered her to keep quiet. After stripping off her clothes, Beavers raped Mrs. Hodges. After Beavers had gone, Mrs. Hodges left her home, called her daughter from a pay phone, and drove to the police department where she reported the crime.

As a result of interviews with Mrs. Hodges, Detective Browning of the Hampton police department obtained an arrest warrant for Beavers and a search warrant for his home. The items specified in

the search warrant included "bloodstained white medical gauze tape" that Mrs. Hodges said Beavers used to wrap around his hand that he cut while he was breaking into her home. At approximately 4:00 a.m., Detective Browning, along with four or five other police officers, arrived at Beavers's home, where he lived with his wife and his parents. Beavers was awakened, told of the charges against him, arrested, handcuffed, and placed in the rear seat of a patrol car in front of his home while the search warrant was executed.

While searching Beavers's home, Detective Davis found a small multi-colored pouch in Beavers's chest of drawers. Davis unzipped the pouch to search for the gauze tape. Inside the pouch Davis found some jewelry that fit the description of jewelry that had been stolen from Mrs. Lowery. In the course of his work in the Lowery investigation, Davis had written a police report that included a description of the stolen jewelry.

When the search of Beavers's house was completed, Beavers was taken to police headquarters and advised of his *Miranda* rights. Beavers acknowledged that he understood those rights. Browning told Beavers of Mrs. Hodges's allegations of burglary and rape, and Beavers immediately confessed to those crimes. Browning then questioned Beavers about the Lowery case, and Beavers "blurted out" that he had killed Mrs. Lowery. Beavers subsequently gave a recorded statement, and then was taken before a magistrate and charged with the offenses.

### III. Issues Previously Decided

Beavers raises certain issues on appeal that have been decided adversely to his claims by previous decisions of this Court. We adhere to those rulings, and we will not discuss them further here. The issues previously resolved are:

A. Defendant should have been granted additional peremptory challenges during the jury selection. *Quesinberry* v. *Commonwealth*, 241 Va. 364, 371, 402 S.E.2d 218, 223, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991); *Buchanan* v. *Commonwealth*, 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989), *cert. denied*, 493 U.S. 1063 (1990).

B. The capital murder statute, Code §§ 19.2-264.2 through -264.5, violates the Eighth Amendment's prohibition against cruel and unusual punishment, the Fourteenth Amendment's guarantee of due process, and the Fifth Amendment's protection against double

jeopardy. *Satcher* v. *Commonwealth*, 244 Va. 220, 227-28, 421 S.E.2d 821, 826 (1992); *Yeatts* v. *Commonwealth*, 242 Va. 121, 126, 410 S.E.2d 254, 258 (1991), *cert. denied*, ___ U.S. ___, 112 S.Ct. 1500 (1992); *Stockton* v. *Commonwealth*, 241 Va. 192, 215-16, 402 S.E.2d 196, 210, *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991); *Quesinberry*, 241 Va. at 370-71, 402 S.E.2d at 222-23.

C. The Commonwealth should have been required to provide the defendant with the names of all witnesses it intended to call at both the guilt and the sentencing phases of the trial. *Watkins* v. *Commonwealth*, 229 Va. 469, 478-79, 331 S.E.2d 422, 430-31 (1985), *cert. denied*, 475 U.S. 1099 (1986).

## IV. Pretrial Proceedings

### A. The Confession

Beavers moved to suppress his confession, given to Detective Browning on the morning of May 15, 1991, arguing that he did not freely and voluntarily waive his constitutional right against self-incrimination. Beavers contends that his confession was involuntary because he had been kept handcuffed in a police car for approximately two hours after his arrest and before questioning. This circumstance, Beavers asserts, was an intentional maneuver of the police calculated to heighten his fears prior to questioning which, in turn, constituted an overbearing of his will resulting in statements that were not the product of a free and unconstrained decision. We disagree.

Detective Browning interviewed Mrs. Hodges concerning the rape at approximately 3:30 a.m., and immediately obtained an arrest warrant for Beavers and a search warrant for Beavers's home. With other members of the Hampton police department, he executed these warrants at that early hour of the morning because, until Beavers was taken into custody, Mrs. Hodges was unwilling to return to her home which was next to the Beavers residence. Beavers was allowed to dress and was taken to the police car where he sat, handcuffed, while the search warrant was executed. While he was in the police car, Beavers talked with his wife and with Officer Merchant. He was told he was not allowed to smoke in the car, but there were no circumstances which indicate that his will was overborne in any manner or that his freedom of choice was constrained. He was in the car for between one and one-half and two hours.

When the police finished their search of Beavers's residence, they transported Beavers to police headquarters and gave him his *Miranda* warnings. He acknowledged that he had been informed of those rights and then gave his oral and written confessions to the crimes against Hodges. When the police told Beavers they were going to question him about the Lowery rape and murder, he proceeded to "blurt out" his confession to those crimes as well.

Although Beavers was emotionally upset while he confessed, he was not confused, and did not appear to have consumed any alcohol. He was responsive and seemed to understand what was going on. The circumstances surrounding Beavers's arrest and questioning contained elements that were neither more coercive nor more threatening than those encountered in any legal arrest. The *Miranda* warnings that Beavers received countered the inherently coercive atmosphere of an arrest. *Moran* v. *Burbine*, 475 U.S. 412, 420 (1986). Detective Browning's decision to keep Beavers in the police car during the search in order to have the opportunity to confront Beavers with any evidence of a crime the officers might find did not constitute coercion and did not affect the voluntariness of Beavers's subsequent confession.

Beavers also contends that the confession should be suppressed because Detective Browning did not bring Beavers before a magistrate "without unnecessary delay," in violation of Code § 19.2-80. Beavers recognizes that the failure to promptly bring a defendant before a magistrate does not require the exclusion of evidence previously obtained, and is not unconstitutional unless the delay would result in the loss of exculpatory evidence which, in turn, would violate a defendant's due process rights. *Frye* v. *Commonwealth*, 231 Va. 370, 376-77, 345 S.E.2d 267, 273 (1986). Beavers does not contend that the delay resulted in the loss of any such evidence. The trial court, therefore, properly rejected Beavers's motion to suppress the statements given to Detective Browning on the morning of May 15, 1991.

## B. The Search of the Pouch

Beavers next assigns error to the trial court's refusal to suppress the use of Mrs. Lowery's rings, discovered during the search of Beavers's home, as evidence. He argues that Detective Davis exceeded the scope of the search warrant when he opened the pouch in which the rings were found.

The search warrant authorized the police to look for "blood-stained white medical gauze tape." The warrant included this item because Mrs. Hodges told the investigating officer that her attacker had cut his hand when he broke a window to gain access to her home, and that he had used some gauze strips from her medicine cabinet to bind the wound. At the time Davis found the pouch, the officers had found none of the items listed on the search warrant. Davis testified that: "The gauze tape is why I opened that pouch . . . . Gauze tape could have been anywhere."

Relying on *Holloman* v. *Commonwealth*, 221 Va. 947, 275 S.E.2d 620 (1981), and *Lugar* v. *Commonwealth*, 214 Va. 609, 202 S.E.2d 894 (1974), Beavers argues that "the search for gauze tape cannot justify the opening of a small purse." Beavers's reliance is misplaced. In *Lugar* and *Holloman*, it was physically and logically impossible that the items sought could have been in the areas searched. In *Holloman*, the officers acknowledged that "real small" paper bags could not have contained the alcoholic beverages that were the legitimate subjects of the search. 221 Va. at 949, 275 S.E.2d at 622. Similarly, the officers searching for an individual in *Lugar* went beyond the scope of the search warrant when "searching in bank bags, trash containers or other spaces which obviously could not hide a man." 214 Va. at 612, 202 S.E.2d at 897.

Detective Davis's belief that the pouch may have contained the gauze was reasonable, based on the size of the pouch and the physical characteristics of gauze, which allow it to be greatly compressed. *See Blair* v. *Commonwealth*, 225 Va. 483, 489, 303 S.E.2d 881, 886 (1983). Accordingly, the trial court properly rejected Beavers's contention that the officers exceeded the scope of the search warrant.

## V. Jury Selection

### A. Individual *Voir Dire* of the Panel

Beavers moved the trial court to question prospective jurors individually, out of the presence of all others, on *voir dire*. The trial court denied the motion, but conducted the *voir dire* in panels of five prospective jurors.

The method of conducting *voir dire* is within the trial court's discretion. *Fisher* v. *Commonwealth*, 236 Va. 403, 410, 374 S.E.2d 46, 50 (1988), *cert. denied*, 490 U.S. 1028 (1989). The purpose of the selection procedure is to select a fair and impartial jury. *Turner*

v. *Commonwealth*, 221 Va. 513, 522, 273 S.E.2d 36, 41 (1980), *cert. denied*, 451 U.S. 1011 (1981). Beavers complains that conducting the *voir dire* in panels of five veniremen gave potential jurors an opportunity to avoid jury service by expressing an objection to the death penalty or an unwillingness to follow the court's instruction on the imposition of the death penalty. He does not, however, contend that this process resulted in a jury panel which lacked impartiality or that he was prejudiced by this jury selection process. *Fisher*, 236 Va. at 410-11, 374 S.E.2d at 50. Accordingly, we find no abuse of the trial court's discretion in refusing to conduct individual questioning on *voir dire*.

▆ Beavers also argues that he was denied an opportunity to question the jurors directly, in violation of Code § 8.01-358. This contention is without merit. At a pretrial proceeding in which motions concerning jury selection were considered, the trial court specifically agreed that Beavers had the right to question jurors directly. The trial court also stated that it would require both Beavers and the Commonwealth to submit their questions in writing prior to trial. At the hearing, Beavers's counsel agreed to this presubmission requirement and did not object to the March 30, 1992 order embodying the court's ruling. Furthermore, during *voir dire*, the court asked Beavers's counsel if they had any questions of the jury panels, and Beavers's counsel did question some jurors individually. Accordingly, we find no merit in Beavers's contention that he was deprived of the ability to examine potential jurors as provided by Code § 8.01-358.

## B. Questioning as to Propensity Toward Death Penalty

Beavers next assigns error to the trial court's refusal to resubmit the following question to the jury panel: "Do you believe that if one is convicted of taking another's life, the proper penalty is loss of your own life?"[1] Beavers argues that the court's ruling on this question prevented him from learning whether any member of the jury panel was predisposed in favor of the death penalty.

▆ In a capital murder trial, potential jurors are questioned to assure that those who would invariably impose capital punishment be removed from the panel. If this purpose is satisfied, "it is not

---

[1] The question in its original form was preceded with the question, "Do you believe in the adage 'an eye for an eye and a tooth for a tooth'?", which Beavers voluntarily eliminated.

reversible error for the trial court to deny defense counsel additional questions on this subject.'' *Mueller* v. *Commonwealth*, 244 Va. 386, 401, 422 S.E.2d 380, 390 (1992); *Morgan* v. *Illinois*, ___ U.S. ___, 112 S.Ct. 2222, 2232-33 (1992). A review of the record in this case shows that the trial court posed questions to prospective jurors that were sufficient to provide Beavers with a basis upon which he could challenge prospective jurors for cause, based on a potential juror's position concerning imposition of capital punishment. Each juror was asked, ''[i]f the jury should convict the defendant of capital murder, would you be able to consider voting for a sentence less than death?'' Those jurors who did not answer affirmatively were questioned individually. The questions asked by the trial court and the replies thereto fully exposed any possible bias of the potential jury members with respect to the imposition of the death penalty. The trial court did not abuse its discretion when it refused Beavers's proffered ''predisposition'' question.

## C. Striking the Entire Jury Panel

Beavers argues that the dismissal of three prospective jurors who expressed opposition to the death penalty, Gurley, Ray, and Hankins, resulted in a jury which was more likely to impose the death penalty and, consequently, that the trial court erred in denying Beavers's motion to strike the entire panel. Beavers did not object at the time the trial court excused each of the three individuals for cause. His objection occurred after the jury had been selected, sworn, and preliminarily instructed by the trial court. Consequently, Beavers waived any objections he had to the exclusion for cause of these three jurors. *See Spencer* v. *Commonwealth*, 238 Va. 295, 306-07, 384 S.E.2d 785, 793 (1989), *cert. denied*, 493 U.S. 1093 (1990).

## VI. The Guilt Phase Issues

## A. The Commonwealth's Opening Statement

Beavers assigns error to the trial court's failure to grant his motion for a mistrial based on comments made by the Commonwealth during its opening statement at the guilt phase of the trial. Beavers complains that the Commonwealth's reference on five occasions to ''recommendations'' by the jury regarding the penalty, and the reference to the recordation of the proceedings, left the jury

with the improper impression that its responsibility in fixing a punishment would be lessened by virtue of further appeal of the case or review of the sentence by others. *Caldwell* v. *Mississippi*, 472 U.S. 320, 326-28 (1985). Beavers also claims that the Commonwealth Attorney's statement that "[w]hen we get through with the Commonwealth's case and whatever case the Defendant decides to offer," required a mistrial because it created an improper impression that the defendant was required to produce evidence to prove his innocence.

■ Correction of improper conduct or statements during oral argument must be sought by counsel in a timely manner. *Cheng* v. *Commonwealth*, 240 Va. 26, 38, 393 S.E.2d 599, 605-06 (1990). This requirement affords the trial court the opportunity to provide cautionary instructions when appropriate to correct the alleged error. In this case, Beavers did not object to any one of the allegedly prejudicial comments at the time they were uttered, but rather, waited until the entire statement was completed. At that time, Beavers moved for a mistrial. Beavers's failure to object in a timely fashion and seek correction of the alleged errors constitutes a waiver of these claims under Rule 5:25.[2]

## B. Deputy Lam's Testimony

Deputy Sheriff William C. Lam was called as a witness by the Commonwealth to relate statements Beavers had made to him regarding Mrs. Lowery's murder. At the beginning of his direct testimony, Beavers's counsel observed that Lam appeared to be reading from a document that had not been admitted into evidence. The Commonwealth's Attorney indicated that the purpose of the document was to refresh Deputy Lam's memory, and then asked Lam whether the document was the one "that [he] previously testified about in this court?" At this point, Beavers's counsel moved for a mistrial. The trial court denied that motion but strongly cautioned the Commonwealth's Attorney to refrain from any further references to another court proceeding.

When Deputy Lam resumed his testimony, Beavers's counsel objected again on grounds that the witness appeared to be reading from the document. The court overruled this objection, and a similar

[2] We also note that Beavers complains on appeal that no cautionary instruction was given. Beavers did not request any cautionary instructions from the trial court and, therefore, we do not consider this argument on appeal. Rule 5:25.

objection made shortly thereafter. However, the court sustained Beavers's third objection to Deputy Lam's apparent reading from the document and instructed the jury to disregard the testimony in its entirety.

Beavers argues that even though the trial court gave the cautionary instruction, Lam's testimony was so prejudicial that the instruction to disregard the testimony given by the court could not cure the error. Deputy Lam testified in part that Beavers told him that "he had no other choice but to do what he had done because [Mrs. Lowery] could identify him." Beavers argues that this testimony provided the only direct evidence of Beavers's intent to kill Mrs. Lowery. Because the jury found Beavers guilty of premeditation in the murder of Mrs. Lowery, Beavers reasons that the statement "so indelibly prejudiced the jury" that it was error for the trial court to simply give a cautionary instruction and to deny Beavers's motion for a mistrial. We disagree.

 A trial court exercises its discretion when it determines whether it should grant a motion for mistrial. Whether improper evidence is so prejudicial as to require a mistrial is a question of fact to be resolved by the trial court in each particular case. *Lewis* v. *Commonwealth*, 211 Va. 80, 83, 175 S.E.2d 236, 238 (1970). Unless this Court can say that the trial court's resolution of that question was wrong as a matter of law, it will not disturb the trial court's decision on appeal. *Spencer* v. *Commonwealth*, 240 Va. 78, 95, 393 S.E.2d 609, 619 (1990), *cert. denied*, 498 U.S. 908 (1991). A judgment will not be reversed for the improper admission of evidence that a court subsequently directs a jury to disregard because juries are presumed to follow prompt, explicit, and curative instructions. *LeVasseur* v. *Commonwealth*, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983), *cert. denied*, 464 U.S. 1063 (1984). When the evidence is so prejudicial that it "probably remained on the minds of the jury and influenced their verdict," however, the judgment will be reversed on appeal. *Asbury* v. *Commonwealth*, 211 Va. 101, 104, 175 S.E.2d 239, 241-42 (1970) (citations omitted).

 In this case, the trial court evaluated the effect of the testimony and, considering the impact of the testimony under all the circumstances, decided that a curative instruction to ignore the testimony was the appropriate corrective measure. Although Beavers asserts that Lam's testimony contained the *only* direct evidence of his intent to kill Mrs. Lowery, evidence supporting premeditation

had already been introduced.[3] Under the circumstances of this case, we cannot say that the trial court erroneously determined that Deputy Lam's testimony was not, as a matter of fact, so prejudicial that a mistrial was warranted. Consequently, the trial court did not abuse its discretion in issuing a prompt curative instruction instead of granting Beavers's motion for a mistrial.

### C. Sufficiency of the Evidence to Show a Willful, Deliberate, and Premeditated Murder

Beavers asserts that the evidence is insufficient to support a finding of premeditated murder because it did not negate his theory that the killing was accidental. Beavers claimed throughout the trial that he merely attempted to keep Mrs. Lowery quiet, and that he did not intend to kill her. Beavers asserts that the testimony of Dr. Presswalla, the deputy chief medical examiner, supports his accidental death theory. Specifically, Beavers notes that the doctor's testimony showed that there had been minimal physical violence and that Mrs. Lowery's heart condition made her particularly susceptible to cardiac arrhythmia, a primary cause of her death. Citing *Inge* v. *Commonwealth*, 217 Va. 360, 228 S.E.2d 563 (1976), and *Stover* v. *Commonwealth*, 222 Va. 618, 283 S.E.2d 194 (1981), Beavers argues that because the evidence of his intent was wholly circumstantial, the evidence must be inconsistent with every reasonable hypothesis of innocence — here the hypothesis of accidental death — and, therefore, that the evidence was insufficient as a matter of law to establish a willful, deliberate, and premeditated killing.

*Inge* and *Stover* are inapposite. In this case, both the *corpus delicti* and criminal agency were established by direct evidence. There was no question that Beavers raped and killed Mrs. Lowery. Under these circumstances, whether the killing was willful, deliberate, and premeditated, or accidental was a question of fact for the jury to determine from all the facts and circumstances. *Edmonds* v. *Commonwealth*, 229 Va. 303, 308, 329 S.E.2d 807, 811, *cert. denied*, 474 U.S. 975 (1985); *Clozza* v. *Commonwealth*, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230 (1985).

The proper standard in reviewing the sufficiency of the evidence on this question of fact requires that the evidence be

---

[3] The evidence supporting the verdict of premeditated murder is discussed, *infra*.

viewed in the light most favorable to the Commonwealth, the prevailing party below, granting to it all reasonable inferences, and the judgment of the trial court must be affirmed unless it appears that it is plainly wrong, or without evidence to support it. Code § 8.01-680; *Pugh* v. *Commonwealth*, 223 Va. 663, 666, 292 S.E.2d 339, 340 (1982). Proof of premeditation, as Beavers acknowledges, will be sufficient, even if the premeditation shown is only slight or momentary. A jury may also consider the brutality of the attack, the disparity in size, strength, and age between the victim and the accused, and the efforts made to avoid detection thereafter in considering the issue of intent to kill. *Epperly* v. *Commonwealth*, 224 Va. 214, 232, 294 S.E.2d 882, 892 (1982).

Here, given his relative age, size, and strength, there is no question that Beavers overwhelmed his victim. Furthermore, it is clear that Beavers held a pillow over Mrs. Lowery's face to silence her, in addition to ripping her clothes and underwear from her body. The evidence also shows that Beavers placed a pillow over Mrs. Lowery's face not just once, but twice. This evidence is sufficient to support a finding that he intended to take whatever actions were necessary to eliminate his victim's resistance. Furthermore, Beavers's intentions were expressed in his own description of his mental state.

[W]hen I was fighting her I had so much anger and evilness come out of me like someone else just took over and was telling me do do do whatever you gotta do. I had no self control of myself at the time I was struggling with her. And my voice got real deep, real deep like the devil was talking for me and I was telling it, ''Shut up, don't make me hurt you shut up.'' After the time I told her that that's when she kept quite [sic] and then she'd start freaking out again and I just got more possessed of trying to control her. I really didn't know what I was doing at that time when she kept fighting me.

. . . .

[W]hat made me do that is the feeling and the control that I had over her at that time when I felt like somebody else was in me just saying do what you got to do, don't let nothing stop you.

Beavers's acknowledgment that he had to ''do what [he had] to do . . .'' evidences his intention to kill Mrs. Lowery by suffocating her to death, if that was necessary to overcome her resistance. Finally, Beavers's actions subsequent to the death of Mrs. Lowery show an intent to avoid detection. He stole and burned her vehicle and acknowledged that he had to ''get out of town,'' all of which indicate his desire to avoid detection.

As we have said, whether the murder of Mrs. Lowery was willful, deliberate, and premeditated was an issue of fact to be resolved by the jury. The jury was not required to accept Beavers's self-serving statements that he did not mean to kill Mrs. Lowery, and that her death was an accident. The jury was fully instructed on the elements of capital murder, as well as on first degree murder. The phrase ''willful, deliberate, and premeditated'' was defined. The jury was directed to find Beavers not guilty of capital murder if it had a reasonable doubt as to whether the killing was accidental or intentional. The jury rejected Beavers's theory. The jury's factual finding of premeditation in the killing of Mrs. Lowery was supported by the evidence, and will not be reversed on appeal.

## VII. Sentence Review

After the proof was completed at the sentencing hearing, the trial court ruled that the evidence was insufficient to support a finding of vileness, and the jury was instructed that imposition of the death penalty would require a finding under the future dangerousness predicate. The jury found that the death sentence was warranted on that basis. Beavers has not challenged the sufficiency of the evidence of future dangerousness.

### A. Passion and Prejudice

Under Code § 17.110.1(C)(1), this Court must determine ''[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.'' Beavers argues that the death sentence was imposed under the influence of passion or some other arbitrary factor because, although the jury could not consider vileness as a predicate for imposition of the death sentence, ''most, if not all the questions asked of [Beavers] by the Commonwealth Attorney concerned the circumstances of the killing of Mrs. Lowery.'' Beavers concludes the imposition of the death sentence

was not based upon evidence of Beavers's future dangerousness, but upon evidence of vileness, and that this constituted imposition of the death sentence "under the influence of passion or another arbitrary factor."

At the penalty phase, cross-examination of Beavers regarding the incidents of Mrs. Lowery's murder and the pictures of the crime scene was proper and admissible evidence, even though the trial court ultimately ruled that the evidence was insufficient to go to the jury on the issue of vileness.

More importantly, the Commonwealth not only introduced evidence of Beavers's prior and continuing drug and alcohol abuse, but also presented the testimony of two women, Mrs. Hodges and Mrs. Stallings, who were raped by Beavers in their homes. Beavers raped Mrs. Stallings seven months after he raped and murdered Mrs. Lowery. Mrs. Hodges was raped three months after Beavers's attack on Mrs. Stallings. Thus, the jury was presented with evidence that established the future dangerousness of Beavers and, therefore, we conclude that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor such as vileness.

## B. Disproportionality of the Penalty

Code § 17-110.1(C)(2) requires that we consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar crimes, considering both the crime and the defendant." Beavers argues that the sentence is disproportionate because it is not based on a long history of prior adult incarcerations. Such evidence, Beavers asserts, has been a factor in the imposition of the death penalty in cases similar to this case. The absence of prior adult incarcerations, and the absence of medical evidence supporting a finding of future dangerousness, Beavers asserts makes the penalty of death excessive and disproportionate in this case. We disagree.

The death penalty has been imposed on defendants with substantial records of prior incarceration. These records are generally reviewed in conjunction with a determination regarding the future dangerousness of the defendant. But a history of prior incarceration is only one of the factors to be considered in making this determination and in making our proportionality evaluation. Here, Beavers did have an extensive criminal history, including vandalism, petit

larceny, assault, and firing into an occupied dwelling. Mrs. Lowery's murder occurred while Beavers was still under supervision for offenses he committed as a juvenile. The murder went unsolved for approximately one year. During that time, the evidence showed that Beavers engaged in two additional rapes of middle-aged women who lived alone. This evidence showed unquestionably that Beavers would commit acts of violence that constitute a continuing serious threat to society.

The penalty of death, in light of this history of violent criminal acts, both preceding and succeeding the murder of Mrs. Lowery, was neither excessive nor disproportionate when compared to sentences generally imposed by sentencing bodies in Virginia for comparable or similar crimes. *See, e.g., Spencer* v. *Commonwealth,* 240 Va. 78, 393 S.E.2d 609 (1990), *cert. denied,* 498 U.S. 908 (1991); *Spencer* v. *Commonwealth,* 238 Va. 295, 384 S.E.2d 785 (1989), *cert. denied,* 493 U.S. 1093 (1990); *Spencer* v. *Commonwealth,* 238 Va. 275, 384 S.E.2d 775 (1989), *cert. denied,* 493 U.S. 1036 (1990); *O'Dell* v. *Commonwealth,* 234 Va. 672, 364 S.E.2d 491, *cert. denied,* 488 U.S. 871 (1988); *Coleman* v. *Commonwealth,* 226 Va. 31, 307 S.E.2d 864 (1983), *cert. denied,* 465 U.S. 1109 (1984); *Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, *cert. denied,* 444 U.S. 919 (1979).

### VIII. Conclusion

We find no reversible error among the issues presented by Beavers's appeals. Having conducted the review mandated by Code § 17-110.1, we decline to commute the sentence of death. Accordingly, we will affirm the judgments entered in both cases.

Record No. 921544 - *Affirmed.*
Record No. 921545 - *Affirmed.*