## Richmond

GEORGE WESLEY MORRIS, JR.

v.

COMMONWEALTH OF VIRGINIA

No. 1688-92-2

Decided January 25, 1994

576

COUNSEL

Ned M. Mikula; Denis C. Englisby (Rudy, Evans & Mikula; Englisby & Englisby, on briefs), for appellant.

Robert B. Condon, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

---

OPINION

**KOONTZ, J.**—George Wesley Morris, Jr. (Morris) appeals his convictions for first degree murder and grand larceny arising out of the death of Jerry Wayne Houck (Houck) and the theft of Houck's automobile. Following a bench trial in the Chesterfield County Circuit Court, the trial judge found Morris guilty and sentenced him to concurrent prison sentences of seventy-five years, with thirty years suspended, for murder, and twenty years for grand larceny. In this appeal, Morris challenges the sufficiency of the evidence to support his conviction for first degree murder. Morris also challenges the use of his confession made during police interrogations, asserting that it was obtained through coercion. For the reasons that follow, we affirm Morris' convictions.

## I.

## FACTUAL BACKGROUND

Casual acquaintances, Morris and Houck frequented the same arcades, pool halls and "hang-outs" in Chesterfield County. On the night of October 25, 1991, both men spent the evening away from home, Morris at a pool hall, Houck on a double date with his friend, Ernie Martin. Sometime after midnight, both men went to Dutch Gap boat landing to join an impromptu party. Both had something to drink at the landing. Around 3:00 a.m., the two left the party together. Morris drove Houck's 1983 Ford Escort to Houck's house.

The two men watched television in the living room. Later Houck went to his bedroom to lie down. Morris took a bowie knife belonging to Houck's father and used the knife to cut Houck's throat. Morris then drove the Escort to his house and hid the bowie knife in a dresser drawer in his bedroom.

Houck's father discovered his son's body later that morning when he returned home. Police issued a "be on the lookout" for the Escort. The following day, a patrol officer encountered Morris driving the vehicle and took him into custody for questioning.

The police advised Morris of his *Miranda* rights on several occasions, and Morris executed a written waiver when he agreed to talk to them. The transcript of the interrogation reveals that Morris changed his account of the death several times after initially admitting he had killed Houck. Morris initially claimed that Houck had requested Morris to kill him, then claimed that Houck had assaulted him, but later said, "I don't know why I did it. It just happened."

During the interrogation, the detectives several times stated that Morris should confess in order to seek God's forgiveness. Once, in response to Morris' request for help, one of the detectives told Morris to "pretend that I am your psychiatrist." The detectives warned Morris that the murder would disturb the community and that people would "want justice done." They told Morris that they knew the judges and would speak to them on Morris' behalf. They also told Morris that he might get the death penalty if he did not confess.

During the trial, Houck's father testified that he normally kept the bowie knife in his bedroom, concealed behind the headboard of his bed. Forensic evidence presented by the Commonwealth showed that

at the time Houck received the fatal wound, he was in a prone position, possibly asleep or passed out.

## II.

### SUFFICIENCY OF THE EVIDENCE TO PROVE
### FIRST DEGREE MURDER

■ It rests within the province of the trier of fact to determine whether a defendant acted willfully, deliberately and with premeditation in killing his victim. *Beavers v. Commonwealth,* 245 Va. 268, 281, 427 S.E.2d 411, 420, *cert. denied,* 114 S. Ct. 171 (1993). We review this finding by viewing the evidence in the light most favorable to the Commonwealth. *Id.* at 281-82, 427 S.E.2d at 421.

In *Hodge v. Commonwealth,* 217 Va. 338, 228 S.E.2d 692 (1976), our Supreme Court stated that evidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation. *Id.* at 343, 228 S.E.2d at 696. When the Commonwealth has proved the commission of a homicide and has pointed out the accused as the criminal agent, the facts of the case may be such as to permit the trier of fact to draw an inference of malice. *Id.* Often it is stated that malice is presumed; however, this "presumption amounts to no more than an inference which the trier of fact is permitted, but is not required, to draw from proven facts." *Id.*

■ The trier of fact may infer malice from the deliberate use of a deadly weapon, unless it has a reasonable doubt whether malice existed. *See Compton v. Commonwealth,* 219 Va. 716, 730, 250 S.E.2d 749, 758 (1979). In this instance, the evidence presented by the Commonwealth proved that Morris used a deadly weapon upon a prone and possibly unconscious victim. The evidence also supports the conclusion that Morris obtained the knife from a concealed location in another part of the house. Taking the steps necessary to locate and obtain a weapon further bolsters the inference of malice.

■ The trial judge was privileged to accept the evidence presented by the Commonwealth and reject the conflicting evidence found in Morris' confession. "'[T]he finding of the judge, upon the credibility of the witnesses and the weight to be given their evidence, stands on the same footing as the verdict of a jury, and unless that finding is plainly wrong, or without evidence to support it, it cannot be disturbed.'" *Speight v. Commonwealth,* 4 Va. App. 83, 88, 354 S.E.2d 95,

98 (1987) (quoting *Lane v. Commonwealth,* 184 Va. 603, 611, 35 S.E.2d 749, 752 (1945)).

## III.

## COERCION OF CONFESSIONS DURING IN-CUSTODY INTERROGATIONS

The Commonwealth has the burden to prove that extrajudicial confessions are voluntarily made. *Campbell v. Commonwealth,* 194 Va. 825, 830, 75 S.E.2d 468, 471 (1953). Absent a knowing and intelligent waiver of the Fifth Amendment right against self-incrimination and the right to the assistance of legal counsel, a confession made by a suspect during in-custody interrogation is inadmissible in evidence against him. *Miranda v. Arizona,* 384 U.S. 436, 475 (1966). Even when the suspect has waived Fifth and Sixth Amendment rights, a confession is inadmissible if it was made involuntarily. *Miller v. Fenton,* 474 U.S. 104, 108-09 (1985). Whether a confession was voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances. *Id.* at 110-12.

In examining the totality of the circumstances surrounding a confession, a court must consider a myriad of factors, including the defendant's age, intelligence, background and experience with the criminal justice system, the purpose and flagrancy of any police misconduct, and the length of the interview. *Harrison v. Commonwealth,* 3 Va. App. 260, 264-65, 349 S.E.2d 167, 169-70 (1986). The totality of the circumstances also includes moral and psychological pressures to confess emanating from official sources. *See Kauffmann v. Commonwealth,* 8 Va. App. 400, 406, 382 S.E.2d 279, 282 (1989).

This Court must make an independent evaluation of the evidence to determine whether the confessions were voluntary. In doing so, we may rely upon the observations of the trial judge and his findings of fact, except as to the ultimate issue of voluntariness. *Goodwin v. Commonwealth,* 3 Va. App. 249, 253, 349 S.E.2d 161, 163 (1986). Morris concedes that, individually, the tactics used by the police in extracting his confession are permissible interrogation techniques.[1]

---

[1] Morris did not concede the legitimacy of one tactic used by police. Morris contends that police statements to the effect that Morris would be subject to the death penalty were wholly improper. However, we agree with the Commonwealth that *in this instance* the detectives may have reasonably believed that the facts surrounding the killing would support a charge of capital murder. Because this was not the specific basis of Morris' appeal, we express no opinion on the general use of such a tactic during interrogation.

Morris argues, however, that the synergy of all of these tactics combined to create a coercive environment depriving him of his will to resist the officers' request for a confession. We disagree.

Without addressing the broader question of whether some combination of interrogation tactics might rise to the level of coercion, we find that the facts of the present case do not support Morris' contention that he was deprived of his will. Rather, it is clear that Morris almost immediately admitted to the killing. During three interrogation sessions over a period of approximately six hours, Morris changed his account of the death and contradicted himself on numerous occasions. The detectives utilized various interrogation tactics in an effort to establish the actual events surrounding the killing. The transcript of the interrogations shows a free flowing discourse between Morris and the detectives. There is no indication that Morris' will was overborne or that any statement he made was a product of police coercion or suggestive questioning. Accordingly, we cannot say that the trial court erred in failing to suppress Morris' confession.

For the foregoing reasons, the convictions appealed from are affirmed.

*Affirmed.*

Willis, J., concurred.

Benton, J., concurring and dissenting.

I join in Parts I and III of the majority opinion. I do not join in Part II, however, because the evidence in the record does not prove that George Wesley Morris premeditated the killing of Jerry Wayne Houck, an acquaintance whom he had known for several months. Premeditation is an element of the offense of first degree murder. *Rhodes v. Commonwealth,* 238 Va. 480, 485, 384 S.E.2d 95, 98 (1989).

The distinction between murder in the first degree and murder in the second degree is well established in Virginia.

Every malicious killing is murder either in the first or second degree — the former if deliberate and premeditated, and the latter if not. Furthermore, there is a *prima facie* presumption of malice arising from the mere fact of a homicide, but there is no presumption therefrom of deliberation and premeditation. This is merely another way of stating the familiar rule of law that every

homicide is *prima facie* murder in the second degree, and that the burden is on the accused to reduce, and on the Commonwealth to elevate, the grade of the offense.

*Jacobs v. Commonwealth,* 132 Va. 681, 686, 111 S.E. 90, 92 (1922). *See also Painter v. Commonwealth,* 210 Va. 360, 364, 171 S.E.2d 166, 169-70 (1969). To prove premeditation, the evidence must establish "(1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Rhodes v. Commonwealth,* 238 Va. at 486, 384 S.E.2d at 98. Each element must be proved beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364 (1970).

The evidence proved that Morris and the victim were friends who had met several months before the killing. They had visited each other's home on several occasions. Only Morris and the victim were present in the victim's home when Morris killed the victim. After Morris was stopped by the police the day following the killing, Morris told the police that he had been drinking beer and playing billiards on Friday night before going to a boat landing where people gathered to drink beer and "hang out." Morris told police that he saw the victim at the boat landing and began to drink beer with the victim and other friends until both he and victim became very intoxicated.

Morris did not testify at trial. In his statement to the police, Morris gave different versions of the events that occurred after they left the boat landing at 3:00 a.m. Initially, he told the police that the victim allowed him to take the victim's automobile so that he could use it to visit a friend the next day. He said that the victim gave him the automobile's keys and left the landing in the company of two girls. Morris said that he fell asleep on a pier after the victim left. When he woke on the pier the next morning at 9:00 a.m., he drove home. Morris claimed that he had tried to call the victim at noon on Saturday but claimed that the telephone had been disconnected.

Upon further questioning, Morris changed his story. He said that he and the victim decided to go to the victim's home after leaving the boat landing. Although both were intoxicated, Morris stated that he drove the automobile while the victim slept. His first explanation for why he had stabbed Houck was, "I don't know why I did it. It just happened." He said he was so intoxicated that he could not remember.

He next said that while they were watching a horror movie, the victim went into the bedroom, got onto his bed, and asked Morris to kill him. Morris said that several knives were on the nightstand next to the victim's bed. Morris said that they both were intoxicated and that he stabbed the victim because the victim asked him to do it.

His final explanation was that while they were drinking and watching television, the victim cursed at him, struck him twice in the side, and went into the bedroom. He said he then followed the victim into his bedroom, pushed him on the bed, grabbed one of the knives from the bedstand next to the bed and stabbed the victim in the throat with a knife.

At trial, a police detective testified that when the police arrived at 10:30 a.m. on Saturday, beer containers were strewn about the living room and the victim's bedroom. The detective also saw empty food cartons from which Morris and the victim had eaten. The television set was on. A filet knife that had no apparent connection with the incident was found on the nightstand next to the victim's bed. Based upon his analysis of the crime scene, the detective found no indication of a struggle.

The medical examiner testified that the blood alcohol concentration in the victim's blood was .07 percent, in the vitreous was .09 percent, and in the urine was .10 percent. He testified that those levels indicated that the blood alcohol concentration in the victim's blood was higher at an earlier time. He saw no defensive injuries, although the victim had a small abrasion on his hand. The medical examiner further testified that the victim received one stab wound and died within minutes of the stab wound. The wound was immediately incapacitating.

The Commonwealth contends that "[b]ased on the evidence of the crime scene and the opinions of the police expert and the medical examiner, the trial judge could have reasonably found that the victim was lying defenseless in bed, possibly asleep, when his throat was cut." That version of the victim's death is only a product of speculation. No evidence proved that the victim was asleep. Moreover, the testimony of the officer concerning the scene of the crime and the testimony of the medical examiner are consistent with all the versions of the incident contained in Morris' statement, i.e. while he was greatly intoxicated (1) he stabbed the victim but could not recall why he did so, (2) he stabbed the victim because the victim asked Morris to kill

him, and (3) he stabbed the victim because of anger after the victim cursed at him.

Nothing in Morris' statement or in the physical circumstances makes any one of the possibilities any more likely than the other.

[I]f facts are susceptible to two different interpretations, "one of which is consistent with the innocence of the accused, the jury or the judge trying the case cannot arbitrarily adopt the interpretation which incriminates him." Instead, "[t]he interpretation more favorable to the accused should be adopted unless it is untenable under all the facts and circumstances of the case."

*Varker v. Commonwealth,* 14 Va. App. 445, 447, 417 S.E.2d 7, 8 (1992) (quoting *Williams v. Commonwealth,* 193 Va. 764, 772, 71 S.E.2d 73, 77 (1952)). Obviously, Morris' statement that he did not know what happened or why he stabbed the victim does not establish premeditation. His statement that he stabbed the victim at the victim's request while both were heavily intoxicated also does not establish deliberation and premeditation.

The Commonwealth also asserts that the evidence proved premeditation because Morris could only have obtained from another part of the house the bowie knife that was used to stab the victim. Morris consistently said, however, that the bowie knife was already on the bedstand in the bedroom when he grabbed it and stabbed the victim. Even if Morris' statement is disregarded, the evidence does not prove the Commonwealth's hypothesis. Although the victim's father testified that the knife usually was kept behind the headboard of his bed in another bedroom, that testimony obviously does not prove that Morris went into that bedroom and obtained the knife to kill the victim. No evidence proved that Morris knew where the knife was concealed. No evidence proved that when Morris and the victim arrived at the house the knife was not then on the dresser by the victim's bed. Indeed, the evidence proved that on the day after the killing, another knife was found on the nightstand next to the victim's bed. Moreover, it is just as likely as not that the victim, who lived in the house, would have known where the bowie knife was concealed and would have retrieved it from the hiding place. The Commonwealth's hypothesis that Morris obtained the bowie knife from another room is purely speculative.

"There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value —

as a criminal defendant his liberty — this margin of error is reduced as to him by the process of placing on the other party the burden of . . . persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt."

*In re Winship,* 397 U.S. at 364 (quoting *Speiser v. Randall,* 357 U.S. 513, 525-26 (1958)).

Because the evidence did not prove beyond a reasonable doubt that any one of the hypotheses of the killing was the version of events that occurred, the evidence failed to prove the element of premeditation and, thus, failed to prove first degree murder. Accordingly, I would reverse the conviction and remand for a new trial.