COURT OF APPEALS OF VIRGINIA

Present: Judges Causey, Raphael and Senior Judge Clements
Argued at Richmond, Virginia

CHRISTOPHER LEE KING

                                   MEMORANDUM OPINION* BY

v.      Record No. 0882-24-2         JUDGE JEAN HARRISON CLEMENTS

                                    OCTOBER 7, 2025

COMMONWEALTH OF VIRGINIA

UNPUBLISHED

FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Leslie M. Osborn, Judge Designate

Monica Tuck, Assistant Public Defender (Virginia Indigent Defense
Commission, on briefs), for appellant.

David A. Stock, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Christopher Lee King of sexual penetration

with an object, abduction, assault and battery, and sodomy. The trial court sentenced King to 65

years and 12 months of imprisonment with 48 years and 12 months suspended. On appeal, King

argues that the trial court erred in denying his motion for a mistrial. He also contends that the trial

court erred in admitting hearsay and prior consistent statements from the victim. We find no trial

court error and affirm the judgment.

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the

sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the

Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74

Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In 2019, A.W. met King and the two began dating. Their relationship involved using illegal drugs, particularly methamphetamine. A.W. spent six weeks in jail beginning in November 2019. During that time, A.W. decided to stop using drugs and end her relationship with King.

King became angry when A.W. avoided contact with him after her release from jail. Nonetheless, A.W. eventually agreed to go out with King for a meal and shopping in late December. Using his mother's car, King picked up A.W. in Lynchburg; rather than go shopping, they went to a friend's house and used drugs. Afterward, King and A.W. attempted sexual intercourse. King was unable to get an erection, and he became angry about that.

While A.W. was driving the car later, King wrapped a seat belt around her neck. In reaction, A.W. told King that she was driving to the Lynchburg police station. King demanded that she stop the car so he could get out and urinate. With King outside the car and urinating, A.W. drove off and left him.

A.W. drove to Appomattox and met her friend, Tammy Mays. They later went to the Dollar General store in Concord.[1] While there, Mays's boyfriend advised that King was there and was angry and that A.W. needed to go outside and talk to him.

Outside the store, King was screaming and demanding that A.W. sit down and talk to him. Mays got into the backseat of the car. A.W. sat in the front passenger seat, but did not

---

[1] King's mother had allowed A.W. to use her car in the past, but had not granted her permission to have it that day.

close the door, and King immediately hit her in the face. King used his fist and then a beer bottle to strike A.W. in the ear, face, hand, and head. He ordered Mays out of the car. As soon as Mays got out, King "took off." King was driving very fast, steering the car with one hand and beating A.W. with the other. King ordered A.W. to remove her clothes. A.W. complied because he continued to hit her. At King's insistence, she threw her pants and shirt out of the car. King berated A.W., said he hated her, and spat at her. He also threatened to harm A.W.'s son and daughter.

As they drove, King told A.W. to pick up a beer bottle and put it into her vagina. A.W. did as King ordered to stop his violence against her. King grabbed the bottle and tried to put it inside A.W., but he was unable to insert it.

King pulled off the road and stopped under a bridge beside the Staunton River and a boat ramp. The public boat ramp was known as a "hangout place." King yelled and threw A.W.'s belongings out of the car. King ordered A.W. from the car, pulled her by her hair to the back of the car, and forced her to bend over the trunk. He penetrated A.W.'s vagina using a beer bottle and then his fingers until she bled.

While King continued to rummage through the car and throw things out, A.W. put her cellphone in a beer box and threw it so that someone would "know where [she] was." Noticing other people arriving at the location, King ordered A.W. into the car and they drove off again. King drove to a store, to a Domino's, and then to a motel. A.W. did not run or try to get help during these stops because she was wearing only a hoodie and because he threatened to kill her and penetrate her daughter with a bottle, as he had done to her.

At the motel room, King made A.W. sit on the floor. He then forced her to suck his penis. At the same time, King told A.W. "how disgusting of a person" she was and that "things

- 3 -

like this would happen to [her] kids." King had A.W. remain on the floor all night while he occupied the bed.

The next morning, King took A.W. to a Dollar General store to get some clothes. Using money from A.W.'s wallet, King bought a phone at Walmart. He drove to the home of his mother, Loretta Robertson, and step-father. King pulled A.W. out of the car, then took her into the house. After she begged him to let her go, King eventually relented and A.W. left on foot.

A passing motorist noticed A.W. walking, stopped his car, and asked if she needed help. A.W. was cold, shivering, crying, and distressed. A.W. was holding her left shoulder, which appeared to be injured. The motorist contacted a state trooper who was nearby, and local law enforcement and EMTs arrived to assist A.W. A.W. later underwent a forensic examination.

On cross-examination at trial, defense counsel confronted A.W. with statements she made during the forensic examination that were contained in the nurse examiner's report. He asked A.W. if she remembered telling the nurse examiner that King had forced her to drive the car to a gas station in South Boston. A.W. clarified that King drove the car away from the bridge, but she drove the car later after they stopped at a gas station and went to a second one. Defense counsel further questioned A.W. about telling the nurse that King inserted the bottle in her while they were driving rather than at the boat landing as she had testified. She acknowledged that she made that statement to the nurse and that King had violated her with the bottle on "more than one occasion." Counsel then confronted A.W. with a statement in the report that she had shut the car door herself as King sped away from Dollar General, rather than the door closing through momentum. A.W. reiterated that she did not close the car door herself despite possibly having told the nurse examiner that she had.

Donna Kling, a forensic nurse, performed the sexual assault examination on A.W. at a Lynchburg hospital.[2] At trial, Kling testified that A.W. described what King had done to her, which was a necessary component of the medical examination and the determination of recommended treatment. The prosecutor asked Kling to read the portion of her report containing A.W.'s account of the ordeal. King objected on hearsay grounds. He further commented that there was "no reason to bolster the witness this way." The Commonwealth responded that the statements were admissible under an exception to the hearsay rule and as prior consistent statements following King's impeachment of A.W. on cross-examination with statements contained in the nurse examiner's report. The trial court ruled that the Commonwealth could question Kling in a limited fashion about A.W.'s statements but only concerning A.W.'s medical history, past or present sensations, and the inception and general cause of her conditions.

In response to the prosecutor's questions, Kling testified that A.W. said King hit her in the face with a glass beer bottle, injuring the left side of her face. A.W. said he "kept spitting" on her and shoved both ends of a beer bottle in her vagina. She reported that he had penetrated her vagina with his fingers until she bled. A.W. said that her right ear was ringing from a hard blow to her face. A.W. also said that King pulled her hair to force her to suck his penis. The prosecutor elicited Kling's testimony as "prior consistent statements" of other details of the ordeal that A.W. had related during the interview. Kling documented 17 injuries on A.W.'s body, and the Commonwealth introduced photographs of them.

Upon further questioning by the prosecutor, Kling stated that when an incident of sexual assault involves "intimate partner violence," she attempts to provide the victim with "education" on that matter. When the prosecutor asked Kling if A.W.'s ordeal had involved an "intimate

---

[2] At trial, Kling qualified as an expert "as a sexual assault forensic nurse and in all the fields that she has expertise in."

partner," King objected, contending that any potential evidence on education offered to A.W. was irrelevant. In response to the objection, the prosecutor argued:

> Your Honor, the witness has testified that part of her expertise that is a subset of being a forensic nurse sexual assault specialist is in the area of domestic violence. The Court has admitted her as an expert as requested over objection of [defense counsel]. And she's going to tell us about the needs of victims in these situations. And it really has to do with informing the jury about how a victim in an intimate partner relationship responds in this setting. It's important in terms of bias. It's important in terms of, well, I wouldn't do it if I were in that situation. Well, the fact is, this is someone who's an expert in how victims over and over and over again -- it was part of the discovery provided to [defense counsel] months ago about what we anticipated Ms. Kling testifying to. And it has to do with Ms. Kling being able to talk about the cycle of violence, talk about how victims will go back to their assailant and then come back out and seek hospitalization or treatment and then simply go back to that relationship. It is part of that cycle of violence. She's going to tell us about guilt, self-blame, the vulnerability of that victim in going back to that relationship. And it is actually completely in line and consistent with the testimony that the Court has heard. So it's important that the jury understand that this is not unusual, that [A.W.] is not a liar because she maintained feelings for Mr. King, so on, and so forth.

Defense counsel then commented that the prosecutor had just "pontificated" and that the line of questioning called for speculation and opinion on an ultimate fact, A.W.'s credibility. The trial court overruled the objection, but cautioned that any testimony elicited from Kling on the subject must "be relevant to this particular case, not a general diatribe about domestic abuse." The prosecutor agreed to limit her questioning that way. The prosecutor then attempted to frame questions to Kling specifically related to A.W., but the trial court ultimately sustained King's objection to the testimony as "generalities."

After the prosecutor further argued the point with the trial court, defense counsel requested a sidebar conference. King then moved for a mistrial because "all the information" that the prosecutor had "spewn out" in argument had "poison[ed] the jury." The prosecutor asserted that her statements constituted proper argument in response to King's objection, that the

jury was not tainted, and that the jury would be instructed that the attorneys' arguments did not constitute evidence. Noting that it did not find generalized testimony from Kling about victims of intimate partner violence to be admissible, the trial court denied the motion for a mistrial.

At the boat landing near the bridge where King had taken A.W., the police recovered three glass beer bottles. They also found A.W.'s pocketbook, mail addressed to her, a shoe, cigarettes, cosmetics, and some trash. They also recovered A.W.'s cell phone inside a beer box. A.W.'s DNA was found on one of the beer bottles that the police collected at the bridge.

Albert Branham was King's jail cellmate for a brief period. Branham testified that, in response to his questions, King revealed that he and A.W. argued while driving and he threw her belongings out of the car. After he attempted sex with her later at a motel, he inserted a beer bottle inside her because he was angry that she was sleeping with one of his friends. He refused to let her go to the police at that point. King said that A.W. got away after they went to his mother's house. Branham admitted having numerous felony convictions, but said that he was no longer incarcerated at the time of trial and the police had made no promises inducing him to testify.

At trial, the Commonwealth introduced recordings of portions of phone conversations that A.W. had with King after he was incarcerated for the offenses. In a conversation, King apologized for what he had done to A.W.

Robertson testified in King's behalf. She said that A.W. had stayed with King at her house for several days over Christmas in 2019. At some point, King and A.W. left with Robertson's car and did not return for several days. When they did return, Robertson did not notice that anything was wrong with A.W. She claimed that A.W. returned to her home and stayed for a week in February 2020 after King was arrested.

A jury convicted King for sexual penetration with an object, abduction, assault and battery, and sodomy. This appeal followed.

ANALYSIS

I. Mistrial

"Whether improper evidence is so prejudicial as to require a mistrial is a question of fact to be resolved by the trial court in each particular case." *Bennett v. Commonwealth*, 29 Va. App. 261, 273 (1999) (quoting *Beavers v. Commonwealth*, 245 Va. 268, 280 (1993)). "Thus, a trial court's denial of a motion for a mistrial will not be reversed on appeal unless there exists a manifest probability as a matter of law that the improper evidence prejudiced the accused." *Id.* at 273-74 (quoting *Mills v. Commonwealth*, 24 Va. App. 415, 420 (1997)). "The party requesting a mistrial has the burden of demonstrating the requisite 'probability of prejudice.'" *Pollino v. Commonwealth*, 42 Va. App. 243, 248 (2004) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 429 (2003)).

King contends that the trial court erred in refusing to grant his motion for a mistrial. King argues that the prosecutor "argued controversial facts about domestic violence" in the presence of the jury in response to his objection to Kling's testimony about victims of intimate partner violence. He claims that "[a]lthough the [c]ourt eventually stopped this line of questioning, the prosecutor's argument inserted this information into the minds of the jury." King further complains that the trial court took "no meaningful corrective action" following the prosecutor's argument.

"Before determining whether the failure to declare a mistrial was prejudicial error, we must decide if there was any error in the first place." *Pollino*, 42 Va. App. at 249. We find no basis to conclude that the prosecutor's argument in response to King's relevance objection was erroneous. The prosecutor was entitled to offer argument to support her position that the

testimony she sought to elicit was relevant. In arguing this point, the prosecutor necessarily described the evidence and its purported relevance to issues in the case. The prosecutor argued her position fairly and did not subject King to prejudice.

To the extent that King now asserts that the prosecutor's argument should not have occurred before the jury or that the trial court should have instructed the jury to disregard it, we note that King did not raise these assertions at the time of the event. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). King failed to raise these contentions at the time the prosecutor offered her argument, and we do not consider them now. Although Rule 5A:18 contains exceptions for good cause or to meet the ends of justice, King has not invoked either exception, and we do not consider them sua sponte. *Spanos v. Taylor*, 76 Va. App. 810, 827-28 (2023).

## II. Evidentiary Rulings

"The determination of the 'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "[T]he abuse of discretion standard requires a reviewing

court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

## A. A.W.'s Statements in Kling's Report

King contends that the trial court erred in admitting statements made by A.W. during her interview with Kling before the forensic examination. He criticizes the trial court for not making "the requisite analysis" and determination of the statements' reliability. The Commonwealth responds that the statements at issue in the report fall squarely within the hearsay exception contained in Virginia Rule of Evidence 2:803(4) and that the issue presented to the Court has been authoritatively decided by *Campos v. Commonwealth*, 67 Va. App. 690 (2017).

"The common law definition of hearsay evidence is 'testimony in court . . . of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein.'" *Id.* at 704 (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). Despite this common-law doctrine, "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible under an exception to the hearsay rule, regardless of the availability of the declarant. Va. R. Evid. 2:803(4). To satisfy the exception, the statement must be made for the purposes of medical diagnosis or treatment, and be "reasonably pertinent to diagnosis or treatment" and relate to "medical history," "past or present sensations," or "inception or general cause of the condition." *Campos*, 67 Va. App. at 712. There must also be sufficient "reliability" for the statement to fall within the exception. *Id.*

- 10 -

King contends that A.W.'s statements were hearsay and not relevant for the purposes of medical treatment. We disagree. A.W.'s statements were precisely what was contemplated by Rule 2:803(4) and held admissible in *Campos*—the general cause or inception of A.W.'s conditions was the sexual assault, sodomy, and other violence that King inflicted upon her in the day before the examination. The past or present sensations she spoke about included the description of him penetrating her vagina with a beer bottle and his fingers, which led to a full examination to determine whether she was injured. A.W.'s examination and statements occurred shortly after her escape from King and were consistent with her injuries, thus bolstering the reliability of her account. We find no abuse of the trial court's discretion in admitting A.W.'s statements to Kling as they clearly met the requirements of Rule 2:803(4).

## B. Prior Consistent Statements

King contends that the trial court erred in admitting statements A.W. made to Kling as prior consistent statements.[3] "[T]here is a general rule excluding the prior consistent statements of a witness that are offered for the purpose of buttressing his testimony at trial." *Anderson v. Commonwealth*, 282 Va. 457, 463-64 (2011). "Nevertheless, in Virginia, there [is a] well-recognized exception[] to this general rule of exclusion. Prior out-of-court statements made by a witness, consistent with his testimony at trial, may, in those circumstances, be admitted for the purpose of rehabilitating the witness after his credibility has been challenged." *Id.* at 464; *see also* Va. R. Evid. 2:801(d)(2)(A) ("A prior statement that is consistent with the hearing testimony of the witness is admissible for purposes of rehabilitating the witness' credibility, but only if . . . the witness has been impeached using a prior inconsistent statement as provided in Rule 2:607 . . . .").

---

[3] Once again, King faults the trial court for failing to give a cautionary instruction to the jury—to consider the statements for purposes of rehabilitation rather than for the truth of the matters asserted. Because King never requested such an instruction, we do not consider whether the trial court erred in failing to give it. *See* Rule 5A:18.

"Where the opposing party has attempted to impeach the witness by offering a prior inconsistent statement made by the witness, prior consistent statements made by the witness are admissible to support the witness." *Anderson*, 282 Va. at 464. "[T]he amount of detail contained in a prior consistent statement that may properly be admitted into evidence is limited. At some point, restatement of the impeached witness' account crosses the line separating rehabilitation from mere repetition . . . ." *Id.* at 466.

King used Kling's report of the forensic examination to show that A.W.'s trial testimony was different from what she told others previously. King asked A.W. if she remembered speaking to Kling and showed A.W. Kling's report. King asked A.W. if she recalled making certain statements to Kling and suggested that they were contrary to her testimony at trial. His use of Kling's report to impeach A.W.'s testimony opened the door for the prosecutor to question Kling regarding statements A.W. made during her examination that were consistent with what A.W. had testified to at trial.

Here, the jury, "having the responsibility of weighing the credibility of the witness, [wa]s entitled to consider both the fact that [A.W.] uttered consistent statements, along with inconsistent statements, and the circumstances in which each was made, in determining the weight to be given to h[er] testimony." *Id.* at 464-65. The trial court thus did not abuse its discretion in permitting the prosecutor to question Kling about consistent statements A.W. made during the examination.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*