COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Callins and Frucci
Argued at Lexington, Virginia


RICHARD DWAYNE BRUNK

                                                    MEMORANDUM OPINION* BY
v.          Record No. 0781-24-3                    JUDGE RANDOLPH A. BEALES
                                                    SEPTEMBER 9, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Bruce D. Albertson, Judge

H. Eugene Oliver, III (Evans Oliver, PLC, on brief), for appellant.

David A. Stock, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Rockingham County convicted Richard

Dwayne Brunk of second-degree murder, in violation of Code § 18.2-32, and use of a firearm in

the commission of murder, in violation of Code § 18.2-53.1.  On appeal, Brunk challenges the

trial court's denial of his motion to suppress the statements that he made during a police

interview.  He also challenges the trial court's denial of his motion for a competency evaluation.

In addition, Brunk challenges the sufficiency of the evidence to sustain his convictions.  For the

reasons that follow, we affirm the trial court's judgment.

I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

(2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

A. The Evidence Presented at Trial

Lauren Jefferson testified at trial that on June 15, 2022, her husband, Ronald Brunk, left their home for work that morning. She exchanged several text messages with her husband throughout the day. She recalled that she was supposed to accompany her husband and her husband's sister, Renee Branner,[1] to look at an assisted-living facility for her mother-in-law. However, Jefferson "didn't feel well enough" at the time, so she "texted him [Ronald Brunk] and asked him if he could meet Renee there and look at the facility with her." Jefferson noted that her husband also had a recreational baseball game scheduled for 7:30 p.m. that evening. Later that day, however, Jefferson "texted him at 5:30 and received no response." She then learned "[a]round 7:00, 7:40" p.m. from her husband's business partner that her husband was dead.

Stanley Michael testified at trial that in June 2022, he was employed by Mast & Brunk, a "plumbing and HVAC mechanical" company that was owned by Ronald Brunk and located in Rockingham County. Michael recounted that on June 15, 2022, he left work "about 5:05" p.m. because he "had an appointment in Staunton at 5:30" p.m. He recalled that Ronald Brunk "was still in [his] office" and that "[h]is truck was still there" at that time. After his appointment in Staunton, Michael stopped by his workplace again "right at 7:00" p.m. because he "was coming down [Interstate] 81" and "wanted to use the restroom." Michael then recounted, "I pulled in and noticed the front door, the glass was shattered on the front door." He noted that "there's a

---

[1] Renee Branner testified at trial that in November 2020, a warrant had been issued for the arrest of her other brother, Richard Brunk (the appellant), after he allegedly had assaulted their father, Gerald Brunk.

wooden door behind" the glass door in "a vestibule like area" and that the wooden door is "normally shut when the business is closed." He took a picture of the broken glass door (which showed that the inner wooden door was open) and then texted that picture to his supervisor. Michael did not approach the building "in case someone was in the building," and he then called 911. He stayed in his truck until the police and his supervisor (Wesley Nolt) arrived. When they approached the broken glass door, they "noticed the body was laying inside the vestibule there" and that there were "feet sticking out through the wooden door." At that time, Michael did not yet know the identity of the body because he "stayed outside the building the whole time."

Wesley Nolt testified at trial that in June 2022, he was also employed by Mast & Brunk and had worked with Ronald Brunk "for about twenty-nine years." Nolt, who recalled seeing Ronald Brunk at work on June 15, 2022, left the office "around 4:00" p.m. that day. He later received a phone call from Michael and then returned to the workplace "about 7:15" p.m., where he saw the broken glass door. He also recalled that Ronald Brunk's "truck was parked there in the usual spot." Nolt then "started looking around" the building, and he recounted that when he "looked in the front door I saw there was somebody laying in there on the floor." However, he could only see "the lower torso" of the body, and he noted that the broken glass door "was locked." After a police officer who had arrived at the building "broke out more glass" to unlock the door, Nolt "followed the deputy" into the building and realized that the body lying on the floor was Ronald Brunk, who Nolt then was able to identify because he "could see his face."

Deputy Dakota Foster of the Rockingham County Sheriff's Office testified at trial that on June 15, 2022, he responded to a dispatch call at "approximately 7:20" p.m. about a breaking and entering. He recounted, "So once I got on location there w[ere] two employees of the facility outside waiting for me who initially called in the complaint. They walked up to me as I pulled in stating that there was a male laying inside the door, laying inside the building." Deputy Foster

- 3 -

recalled, "[T]he exterior glass door that was in that front area it appeared it was broken. I cleared out more of the glass so that I could make entry into the" building. When Deputy Foster entered the building, he encountered "[a] male subject" (later identified as Ronald Brunk) who "appear[ed] to be unconscious laying on the ground." Deputy Foster attempted to resuscitate Ronald Brunk, but he had no pulse and "[i]t did appear as he was deceased." Deputy Foster noted, "Initially I did not realize Mr. [Ronald] Brunk had been shot. I didn't see any blood or any obvious wounds. I did not understand what exactly had happened to him at that time so I did not think to look for shell casings."[2] He also walked around the building to secure the premises, and he recalled seeing a warrant "on the floor in the office to the left of the doorway."[3] Deputy Foster stated that the warrant was charged against Richard Brunk and named Gerald Brunk (the father of Richard Brunk and Ronald Brunk) as the victim of an alleged assault and battery.

Special Agent Wanda Beard of the Virginia State Police testified at trial that she assisted the Rockingham County Sheriff's Office with collecting and documenting evidence at the crime scene. She recalled seeing a chair that appeared to have been pushed back or knocked down "in the same room with the warrant." She also recalled seeing evidence of metal pellets that may have caused Ronald Brunk's fatal injuries. She noted that "at the top of the doorway there was a piece of glass embedded in the wall, along the wall, but no pellets in it, not that I saw."

---

[2] Frank Jackson (a volunteer firefighter) testified at trial that he "saw a male laying on the floor who appeared to be deceased." While doing chest compressions on Ronald Brunk's body, Jackson realized that "the injury was a lot more severe than it looked at first and there was major bleeding from those compressions." In addition, Tristan Naftel (a paramedic who was also there at the crime scene) testified at trial that he "initially didn't think there was any foul play or anything," but that "through further exposure" he "did find injury that made me believe that there was possibly foul play." In particular, Naftel observed "a penetrating injury" in "the high chest left" part of Ronald Brunk's body. After attempting to provide medical attention, Naftel "did not see any signs of life," and he declared Ronald Brunk's death around 7:51 p.m.

[3] Deputy Trey Carter, a former officer with the Rockingham County Sheriff's Office, testified at trial that he also saw a warrant on the ground in the building and that he picked up the warrant. In a back office within the building, he recalled seeing signs of a physical struggle.

Addressing the condition of Ronald Brunk's body, Special Agent Beard stated, "There are--well, you've got the metal debris, on the face there are some penetrating wounds that were evidenced. When he was moved there w[ere] small round metal pellets consistent with shotgun pellets." She also saw injuries to the side of Ronald Brunk's face. Special Agent Beard collected several "[p]lastic, what appeared to be shell wad pieces" from the crime scene.

Investigator Daniel Conley of the Rockingham County Sheriff's Office testified at trial that he assisted with the execution of a search warrant at Richard Brunk's residence "in Weyers Cave, Augusta County" on June 15, 2022. He noted that there was a large red truck parked outside Brunk's house, and he saw "[a] camouflage pump action .12 gauge shotgun" on the floor of the truck. He also saw that "[t]here were multiple different locations with a red staining inside and outside of the truck"—including a paper towel covered in blood that was found in the truck, as well as blood on the driver's side "[a]rmrest door panel." Investigator Conley found one used shell casing in the truck. He also photographed a bloody gray shirt inside Brunk's residence, as well as two boxes of shotgun shells.

Investigator Kyle Dolph of the Rockingham County Sheriff's Office testified at trial that he was the lead investigator in this case. He explained that the police "had developed Mr. [Richard] Brunk as a person who possibl[y] could have been involved in this investigation and we received information that he was at his residence." On June 15, 2022, after having first gone to the crime scene, Investigator Dolph then went to Richard Brunk's residence, where he encountered Brunk "on the front porch" and "had a conversation with" him. He noted that Brunk "was able to respon[d] and answer . . . any questions we had." The investigating officers then transported Brunk from his home to the Rockingham County Sheriff's Office because they "wanted to speak to him regarding an incident between he and his brother and we asked if he would be willing to come back and speak to us." Investigator Dolph stated that Brunk agreed to

speak with the officers. At the police station, the officers read Brunk his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and Brunk then signed a *Miranda* warning form.[4]

Brunk told the officers that he had gone to his brother's workplace "to have a conversation with him about that warrant"—which had been issued against him in 2020 by their father for "assault and battery" but had only "recently been served on" him. Brunk explained to the officers that he had parked his truck perpendicular against his brother's truck in order to prevent his brother from being able to leave his workplace because Brunk "wanted to force that conversation with his brother." Brunk went on to tell the officers that after he and his brother had been involved in a "physical altercation," he "was told to leave the business of Mast & Brunk by his brother" and then "walked out of the business."[5] Brunk claimed that he went back outside to his truck because he "believe[d] that Ronald was coming after him." "[I]n a matter of very few seconds," Brunk then fired his shotgun through the "locked front door" of the building, striking his brother from the front. Investigator Dolph recalled that Brunk "said a couple times

---

[4] When asked why the *Miranda* warning form referenced the crime of "felony assault," Investigator Dolph explained, "At that point and time we were investigating a death, did not know the circumstances that led up to that death, so we were investigating any and all crimes that could have been associated with that death."

[5] Investigator Dolph noted that he did not see any injuries on Richard Brunk's hands that would have been indicative of a physical altercation between Brunk and his brother, Ronald Brunk, although there were contusions on Ronald Brunk's right knuckles.

that he had no regrets as far as what had happened."[6] He also noted that Brunk offered his explanations spontaneously without being prompted by questions during the interview.[7]

Brunk was arrested on charges of first-degree murder and use of a firearm in the commission of murder. Investigator Dolph testified that he collected evidence at Brunk's residence, including "a gray Nike t-shirt that had some brown stains that was in the washing machine." Investigator Dolph also found "a .12 gauge pump shotgun" that "was located in the rear passenger floorboard of that red Chevy Silverado" parked outside Brunk's residence, two boxes of ammunition "sitting next to the shotgun on the floorboard" of Brunk's truck, and "a spent shotgun shell" that "was located under the rear passenger seat" of Brunk's truck.

Several individuals who had been incarcerated at the Rockingham County Jail with Brunk testified at trial. Michael Eshbaugh, who had been Brunk's cellmate, testified that Brunk admitted to shooting his brother. Eshbaugh recounted that Brunk

> said that he stopped by his brother's work sometime in the
> evening, that his brother was still at work and that was the time
> that he usually wasn't there so he stopped in there. He said he was
> pissed off from the night before, he got arrested the night before
> for a domestic violence charge against his father and his brother
> was the one that took him down to get the warrant for him. And he
> said he sat out there in the parking lot. He had blocked his

---

[6] Investigator Dolph noted that Brunk had sworn out a criminal complaint against his brother the same evening after his brother's death. The criminal complaint stated:

> I base my belief on the following facts. Upon entering my
> brother's business we had a verbal exchange followed by him
> attacking me, hitting me in my left eye, my nose and leaving me
> bloodied and bruised. After getting up off the floor he chased me
> out the front door of his business. Afterwards I left and went home
> where I had to put an ice pack on my eye and clean all the blood
> off my face.

[7] Lieutenant Wesley Burgoyne of the Rockingham County Sheriff's Office testified at trial that during the interview, Brunk "was coherent, spoke clearly, answered questions clearly, [and] wasn't confused." He stated that Brunk voluntarily consented to the interview, and he confirmed that Brunk read and signed the *Miranda* warning form. He acknowledged that Brunk "had a black eye on his left eye" and that Brunk had "mentioned his side hurt."

brother's truck off so he couldn't drive out, for a little while and
his brother never came out.

Eshbaugh recalled that Brunk also told him that

he grabbed his warrant that he had gotten from the night before and
went into his brother's business and he didn't see anybody in the
front lobby so he went to the back office to the left I guess is where
his brother's office was. He could see him in there so he went
back there and showed his brother the warrant and asked him if he
was responsible for that and his brother said yes, I am. He said just
maybe a second or two later he jumped up and the fight was on and
they got into a big fight. He said after the fight he left the building,
went out to his truck and got a shotgun, went back to the building,
I guess his brother was coming out of the building and saw the
firearm. And I guess he just scared him so much that he fell down,
picked himself up and run back into the building and locked the
door. He said he seen him go back in the building and lock the
door. He said he had the gun in the firing position and he just shot
him.

John Leber, who had been housed in the same pod as Brunk, testified at trial that he and
Brunk had discussed "both our cases" while in jail together. Brunk told Leber that he had been
"waiting for his brother" because "he wanted to talk to him" about their father. Brunk then told
Leber about how he and his brother "got to fighting," and Leber noted that Brunk "said his
brother beat him up." Brunk then "went back to the truck and got the gun that was already
loaded and went back to the building and shot his brother." Leber clarified that Brunk "had told
me that his brother had already come out the door and run back in and locked it." When asked
whether Brunk had expressed any remorse for shooting his brother, Leber stated, "No. He
actually told me that 'I wanted to blow his fucking head off.' Excuse my French."

Jerry Buracker, who "was housed at Rockingham County Jail in the same block" as
Brunk, testified at trial that Brunk had told him that

he had had problems with his brother over a car title. He talked
about his brother and his sister about having problems with both,
but he had spoken highly about a car title that his--his father had
promised him a car is the way he put it, but then he said his brother

- 8 -

had convinced his father to give it to him and that's what started the commotion between him and his brother.

Buracker testified that Brunk explained to him that Brunk had gone to his brother's workplace "to confront his brother" and "to put an end to his brother taking things from him." Brunk told Buracker that "he parked in a way to block his brother in"—and Brunk also "picked out a .12 gauge pump shotgun and special turkey shot shells he was going to use. He said he was going to end it, end his brother taking things from him." When Brunk went to his brother's office, Brunk "slammed the car title down on his brother's desk and when his brother went to get up he struck his brother and a fight broke out." According to Buracker, Brunk went on to tell him

> that after he got up and seen that his brother had beat him up he went out to the truck and he got that .12 gauge shotgun and it was loaded with turkey shots and he said when he come back to the door he seen his brother coming through the door so he raised the gun up and he said there was a sight on the end of it that he knew his target was in sight so he shot through the door.

After the Commonwealth presented its case, counsel for Brunk moved to strike, arguing that "there's insufficient evidence to support malice for the murder charge." The trial court denied the motion, stating, "I do find that there is sufficient evidence for the case to go forward on all matters and that the Commonwealth has met its burden at this stage of the case." The defense did not present any evidence, and counsel for Brunk renewed his motion to strike without offering any additional argument. The trial court denied the renewed motion to strike, stating, "I find that this is still a jury question."

### B. The Motion to Suppress

Before trial, Brunk's counsel moved the trial court to suppress the statements Brunk made to the officers during the police interview. Counsel for Brunk argued that Brunk's "waiver of his right to remain silent was not made knowingly and intelligently due to [his] injuries" and that "therefore the waiver was invalid." Brunk's counsel maintained that Brunk "showed

- 9 -

multiple signs of physical trauma to his head preceding his custodial interrogation at the Rockingham County Sheriff's Office"—and that Brunk "was not offered any medical attention during the entire hours-long encounter with law enforcement, nor was his cognitive functioning assessed in any way." In addition, Brunk's counsel argued that Brunk's "waiver of his right to remain silent was obtained by fraud by law enforcement." Counsel for Brunk contended that Brunk "was vaguely informed about the subject matter of the interrogation—the words 'felony assault' on the waiver form—but was not given any further clarification from investigators whatsoever." Brunk's counsel also contended that Brunk was coercively encouraged to waive his *Miranda* rights "because he was allowed to believe he was speaking from the position of a victim in the case, or alternatively as the suspect of just an assault, but not as a murder suspect."[8]

At the hearing on the motion to suppress, Investigator Kyle Dolph testified that on June 15, 2022, he responded to a dispatch call and discovered the deceased body of Ronald Brunk. The police then identified Ronald Brunk's brother, Richard Brunk, as a suspect. Investigator Dolph first encountered Richard Brunk "[a]t his residence" later that same evening, and he recalled that Brunk "had a black eye and some bruising on his other eye, and also some abrasions." He stated, however, that Brunk did not appear confused, that he was responsive to questions, that he answered questions clearly, and that he made no indication that he was experiencing headaches or any other pains. Investigator Dolph learned that Brunk had traveled to his brother's workplace earlier that day and then had driven himself back home. Brunk then "advised that he had driven to the Rockingham County magistrate's office and swore out the warrant against his brother, Ronald Brunk, for assault and battery." Investigator Dolph noted

---

[8] At the hearing on the motion to suppress, however, counsel for Brunk conceded, "I agree that there's no coercion," but he "wouldn't agree that there's no trickery."

that when he transported Brunk to the Rockingham County Sheriff's Office, Brunk "appeared normal" and "did not appear to be having kind of any disorientation or abnormalities."

Investigator Dolph further testified that he and Lieutenant Wesley Burgoyne read Brunk his *Miranda* rights before conducting the interview. Brunk also read the *Miranda* warning form before he initialed and signed the form. The *Miranda* warning form provided, "You have an absolute right to remain silent," "Any statement you make with or without counsel can be used as evidence against you," and, "You have a right to the presence of an attorney during this or any further interview that Sheriff's Office might have with you. The attorney may be one of your own choosing which you retain, or if you are without funds to employ counsel, the court will appoint an attorney for you." The *Miranda* warning form further provided, "You are being interviewed in connection with the alleged commission of the crime of felony assault."[9] The officers then again reminded Brunk of the *Miranda* warning. Investigator Dolph noted that Brunk "did acknowledge that he understood it" and at no point did the officers question whether Brunk understood his *Miranda* rights. Investigator Dolph testified that during the interview, Brunk was able to recall past events and "was able to recall all of his personal information." He

---

[9] Investigator Dolph acknowledged that the officers told Brunk "toward the conclusion of the interview" that his brother was deceased—and Investigator Dolph noted, "It just seemed like it was new information to him." However, Investigator Dolph maintained, "There was no intention to mislead" Brunk, stating:

> We didn't know what happened. We were investigating a death.
> We did not know it was a murder or not at that point. And did, to
> further state, I would say that we didn't know what had caused that
> death, and in order to not taint or prejudice any statements that he
> was going to make, I didn't want to put any bias into his head to
> think that, you know, somebody was dead. I wanted to get his side
> of the story, fresh and clean.

Investigator Dolph explained that he does not tell suspects what he perceives the facts of a crime scene to be, that he does not interpret what forensic evidence might be present at a crime scene, and that he does not tell suspects what he knows or what other witnesses may have said.

also noted that Brunk appeared oriented to time and place, he was responsive to questions, and he did not appear to have any head injury at the time. According to Investigator Dolph, Brunk also "believed that his brother should be sitting in the chair where he is sitting currently."

Before ruling on the motion to suppress, the trial court viewed a video recording of Brunk's interview with the officers. During an exchange with Brunk's counsel, the trial court noted, "I don't even recall a question being asked. Your client [Brunk] just starts on a tear." The trial court also noted that "the officers don't even ask him [Brunk] hardly a question" before Brunk "is just offering up" his statements to the officers. After having "considered the totality of the evidence," the trial court denied the motion to suppress, stating:

> So, this is a case where there was an investigation. I don't hear any evidence to show that this was in fact an inducement form. All of the evidence that I have seen shows the demeanor of a person that wants to talk and is not being induced by that statement. I am finding that it's a free and voluntary statement . . . that he's making, and he's in my view, clearly choosing to do so. There was not a single response in there to a question that I heard. He decided to start talking and was very detailed about it. So from the evidence that I have, again, I deny the motion to suppress.

The trial court memorialized its ruling in an order entered on May 4, 2023.

### C. The Motion for a Competency Evaluation

Before trial, Brunk's counsel also moved the trial court to order that Brunk's competency to stand trial be evaluated pursuant to Code § 19.2-169.1. In support of the motion, counsel for Brunk contended, "Based upon a review of materials received from the Commonwealth in discovery on October 20, 2023 and new indictments alleging the Defendant's solicitation of the [Commonwealth's Attorney] Ms. Garst's murder, Counsel believes that the Defendant may have a latent mental-health issue that would affect his competency to stand trial."

At a hearing on the motion, Brunk's counsel represented that after speaking with Brunk, "I have concerns about what he's processing and how he's reacting. I don't know if it's an

- 12 -

emotional issue that actually manifests itself in his ability to function, but I would not be comfortable trying the case without having a letter from a doctor saying he's indeed comfortable." In response to that representation, the trial court stated that Brunk "seems to understand, from what I've seen from him, things like speedy trial. You know, he showed his, his frustration with that at one point. He seemed to understand continuances, understands your role, clearly understands [the Commonwealth's Attorney] Ms. Garst's role. I would think he understands mine." Counsel for Brunk "agree[d] with the Court," but he reiterated that "it doesn't appear to me that he's processing what's going on correctly." Brunk's counsel represented that Brunk "may have a latent issue that doesn't manifest itself when you talk to him for five minutes, fifteen minutes, even for an hour and a half meeting," but that "when you come back and talk to him again and you see what his, it's irrational; and it's, it's very troubling to me." Brunk's counsel did not present any evidence beyond his representations to the trial court, and he did not call his client to testify on the issue of competency to stand trial.

At a subsequent hearing, the trial court denied the motion for a competency evaluation. In so ruling, the trial court noted that the court had not observed any signs of irrational conduct by Brunk and that "at this stage all I have is some expressed doubts at this point by defense counsel with nothing more." The trial court emphasized, "Every step of the way Mr. Brunk has been a person that appears to understand the situation, understands the roles of counsel, understands the role of the Judge, seems to understand the type of charges that he's facing, all of the issues regarding competency." The trial court then concluded that "those doubts that he [counsel for Brunk] expressed in the Court's view are not sufficient probable cause" to warrant ordering a competency evaluation. By order entered on December 6, 2023, the trial court memorialized its ruling, noting that

> the Court did not find probable cause to support that the Defendant
> lacked substantial capacity to understand the proceedings against

him or to assist his attorney in his own defense.  Defense Counsel was given leave to return the matter to the docket to renew the motion should any evidence of a lack of competency arise.

### D.  The Jury's Verdict and Recommended Sentence

After hearing the evidence and arguments at trial, the jury found Brunk guilty of second-degree murder and use of a firearm in the commission of murder.  By final sentencing order entered on May 9, 2024, and in accordance with the jury's verdict and recommended sentence, the trial court sentenced Brunk to 43 years of incarceration.  Brunk now appeals to this Court.

## II.  ANALYSIS

### A.  The Motion to Suppress

On appeal, Brunk argues, "The trial court erred in denying appellant's motion *in limine* to suppress statements made by appellant to law enforcement."  Brunk contends:

> The evidence presented at the suppression hearing and at trial in this matter was consistent with Appellant's position that the *Miranda* waiver was not knowingly or intelligently made and that it was a result of his will being overborne due to both his physical and mental state and the coercive trick played by law enforcement in this matter by actively misleading him as to the subject of the interview and inquiry.

The Supreme Court has often stated, "The defendant has the burden to show that, when viewing the evidence in the light most favorable to the Commonwealth, the trial court's denial of the motion to suppress was reversible error."  *Sidney v. Commonwealth*, 280 Va. 517, 522 (2010); *Harris v. Commonwealth*, 276 Va. 689, 695 (2008); *Jackson v. Commonwealth*, 267 Va. 666, 673 (2004).  "We review de novo the trial court's application of the law to the particular facts of the case."  *Branham v. Commonwealth*, 283 Va. 273, 279 (2012); *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008).  However, we are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the

inferences drawn from those facts by resident judges and local law enforcement officers."

*McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc).

It is well-established that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164 & n.2 ("Even where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause."). *See also Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns."). "The amount of coercion necessary to trigger the due process clause may be lower if the defendant's ability to withstand the coercion is reduced by intoxication, drugs, or pain, but *some* level of coercive police activity must occur before a statement or confession can be said to be involuntary." *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992).

"The test for voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" *Jenkins v. Commonwealth*, 244 Va. 445, 453-54 (1992) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). "When determining whether a defendant's will has been overborne, the totality of the circumstances must be examined, including the defendant's experience and background as well as the conduct of the police." *Id.* at 454. Although "[v]oluntariness is a question of law, subject to independent appellate review," the Supreme Court has stated, "Subsidiary factual questions, however, are

entitled to a presumption of correctness." *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)); *Tirado v. Commonwealth*, 296 Va. 15, 28 (2018). A trial court's finding that an accused's "will was not overborne is a factual finding, entitled on appeal to the same weight as a finding by a jury, and will not be disturbed unless plainly wrong." *Bailey v. Commonwealth*, 259 Va. 723, 746 (2000).

In this case, Investigator Dolph testified at the hearing on the motion to suppress that when he first encountered Brunk at Brunk's residence, Brunk did not appear to be confused, he was responsive to questions, he answered questions clearly, and he made no indication that he was experiencing headaches or any other pains. Although Brunk "had a black eye and some bruising on his other eye, and also some abrasions," Investigator Dolph stated that Brunk "appeared normal" and that he "did not appear to be having kind of any disorientation or abnormalities." During the police interview, Investigator Dolph and Lieutenant Burgoyne read Brunk his *Miranda* rights before conducting the interview, and they also allowed Brunk to read the *Miranda* warning form before he initialed and signed the form. Investigator Dolph noted that Brunk "did acknowledge that he understood" the *Miranda* warning form. Furthermore, Brunk was able to recall past events, he "was able to recall all of his personal information," and he appeared to be oriented to time and place. Brunk even indicated to the officers that he "believed that his brother should be sitting in the chair where he is sitting currently."

After hearing the evidence and observing a video recording of Brunk's interview with the officers, the trial court stated, "I don't even recall a question being asked. Your client [Brunk] just starts on a tear." The trial court also stated that "the officers don't even ask him [Brunk] hardly a question" before Brunk "is just offering up" his statements to the officers. *See Watts v. Commonwealth*, 38 Va. App. 206, 218 (2002) ("Where a suspect in custody makes spontaneous admissions, which are not a product of interrogation, the statements are admissible and their

admission does not violate the suspect's right against self-incrimination."); *Bradshaw v. Commonwealth*, 228 Va. 484, 490 (1984). In addition, the trial court found that the evidence "shows the demeanor of a person that wants to talk and is not being induced by that statement," that "it's a free and voluntary statement . . . that he's making" and "clearly choosing to do so," and that Brunk simply "decided to start talking and was very detailed about it." The trial court then found that there was no "evidence to show that this was in fact an inducement form."

In short, considering the totality of the circumstances, the record before this Court on appeal establishes that there was no evidence of police coercion during the interview with Brunk. Indeed, during argument before the trial court on the motion to suppress, counsel for Brunk expressly conceded, "I agree that there's no coercion." Furthermore, the trial court was not plainly wrong in finding that Brunk's demeanor was that "of a person that wants to talk"—and that Brunk simply "decided to start talking" without having been induced to do so by the officers. Consequently, the trial court did not err in denying Brunk's motion to suppress.

### B. The Motion for a Competency Evaluation

Brunk next argues, "The trial court erred in denying appellant's motion for a competency evaluation of appellant." He contends, "There was probable cause to believe that a competency evaluation was appropriate under § 19.2-169.1 of the Code of Virginia to determine whether Appellant lacked the substantial capacity to understand the proceedings against him or to assist his attorney in his own defense."

Code § 19.2-169.1(A) provides:

> If, at any time after the attorney for the defendant has been retained
> or appointed and before the end of trial, the court finds, upon
> hearing evidence or representations of counsel for the defendant or
> the attorney for the Commonwealth, that there is probable cause to
> believe that the defendant, whether a juvenile transferred pursuant
> to § 16.1-269.1 or adult, lacks substantial capacity to understand
> the proceedings against him or to assist his attorney in his own
> defense, the court shall order that a competency evaluation be

- 17 -

performed by at least one psychiatrist or clinical psychologist who (i) has performed forensic evaluations; (ii) has successfully completed forensic evaluation training recognized by the Commissioner of Behavioral Health and Developmental Services; (iii) has demonstrated to the Commissioner competence to perform forensic evaluations; and (iv) is included on a list of approved evaluators maintained by the Commissioner.

The standard for competency is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)). "The defendant has the burden of showing a 'bona fide doubt' concerning his competency." *Johnson v. Commonwealth*, 53 Va. App. 79, 92 (2008) (quoting *Beck v. Angelone*, 261 F.3d 377, 387 (4th Cir. 2001)).

Determining whether there is probable cause to believe that the defendant lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense "involves the exercise of discretion by the circuit court in weighing the facts presented on the question of competency." *Dang v. Commonwealth*, 287 Va. 132, 146 (2014), *cert. denied*, 574 U.S. 853 (2014). *See also Johnson*, 53 Va. App. at 95 ("The court remains on a duty to watch a defendant's behavior for signs of irrational conduct."). "The requirement of probable cause 'relates to probabilities that are based upon the factual and practical considerations of everyday life as perceived by reasonable and prudent persons. The presence or absence of probable cause is not to be examined from the perspective of a legal technician.'" *Id.* at 93. Thus, an appellate court "review[s] a circuit court's decision not to order a competency evaluation only for abuse of discretion." *Dang*, 287 Va. at 146 (quoting *Johnson*, 53 Va. App. at 93); *Orndorff v. Commonwealth*, 271 Va. 486, 500 (2006).

In reviewing a trial court's decision not to order a competency evaluation, this Court considers "the diligence of defense counsel in seeking an evaluation" and "the history of defense

- 18 -

counsel's satisfaction with the client's mental health." *Johnson*, 53 Va. App. at 93-94.  This Court should also "strongly consider representations by defense counsel." *Id.* at 94.  However, "such statements, standing alone, do not typically provide probable cause for an evaluation." *Id.* Rather, defense counsel may "present expert testimony or layperson observations," or "even detailed evidence from counsel." *Id.* at 95.  Furthermore, although "a defendant's behavior during court may under some circumstances provide the requisite evidence," a defendant's disruptiveness "does not entitle him to a competency exam where he can understand the proceedings and participate in his defense." *Id.* at 95-96.  A defendant "must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel." *Id.* at 96 (citation omitted).  *See also Dang*, 287 Va. at 148 (recognizing that "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial" (quoting *Walton v. Angelone*, 321 F.3d 442, 460 (4th Cir. 2003))).

In this case, although counsel for Brunk represented to the trial court that Brunk "may have a latent issue" and expressed "concerns about what he's processing and how he's reacting," Brunk's counsel did not present any evidence or testimony to the trial court beyond his own general representations.  *See Johnson*, 53 Va. App. at 97 (holding that the "vague, unsubstantiated representations of counsel did not provide probable cause to doubt [the defendant's] mental capacity").  Brunk's counsel even "agree[d] with the Court" when the trial court observed that Brunk "seems to understand, from what I've seen from him, things like speedy trial.  You know, he showed his, his frustration with that at one point.  He seemed to understand continuances, understands your role, clearly understands [the Commonwealth's Attorney] Ms. Garst's role.  I would think he understands mine."  The trial court went on to observe, "Every step of the way Mr. Brunk has been a person that appears to understand the

situation, understands the roles of counsel, understands the role of the Judge, seems to understand the type of charges that he's facing, all of the issues regarding competency."

In short, the general representations made by Brunk's counsel, without more, simply were not enough to establish probable cause to order a competency evaluation. Because there was not probable cause to believe that Brunk lacked substantial capacity to understand the proceedings against him or to assist his attorney in his own defense, the trial court here did not abuse its discretion in denying Brunk's motion for a competency evaluation.

### C. The Sufficiency of the Evidence

Brunk also argues:

> The trial court erred in convicting appellant of both charges as the evidence was insufficient as a matter of law because the evidence presented failed to prove necessary elements of second-degree murder. Accordingly, since the evidence was insufficient as a matter of law to convict appellant of second-degree murder, it likewise was insufficient as a matter of law to convict appellant of use of a firearm in the commission of a felony.

He contends that "the Commonwealth failed to show malice, which is a necessary element of the charge of second-degree murder (and first-degree murder, which is how this matter was originally charged)." He further contends that "a reasonable trier of fact would only come to the outcome that Appellant acted in the heat of passion and therefore, as a matter of law, could not have acted in malice or be guilty of second-degree murder."

The Supreme Court has stated, "When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable

doubt.'" *Secret*, 296 Va. at 228 (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Clark v. Commonwealth*, 279 Va. 636, 641 (2010) (quoting *Commonwealth v. Jenkins*, 255 Va. 516, 520 (1998)).

"'Murder' is the unlawful killing of another with malice." *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997). The Supreme Court "has long defined malice as 'the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). *See also Essex v. Commonwealth*, 228 Va. 273, 280 (1984) ("The authorities are replete with definitions of malice, but a common theme running through them is a requirement that a wrongful act be done 'wilfully or purposefully.'" (quoting *Williamson v. Commonwealth*, 180 Va. 277, 280 (1942))). In Virginia, all murder other than aggravated murder and first-degree murder is second-degree murder. Code § 18.2-32; *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982). "Although '[m]alicious intent is an element of both first degree murder and second degree murder,' for purposes of second degree murder, proof of specific intent *to kill* is not required." *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989) (quoting *Baker v. Commonwealth*, 218 Va. 193, 195 (1977)).

It is well-settled that "malice may be either express or implied by conduct." *Watson-Scott*, 298 Va. at 256 (quoting *Essex*, 228 Va. at 280). "Express malice is evidenced when 'one person kills another with a sedate, deliberate mind, and formed design.'" *Id.* (quoting *Pugh*, 223

- 21 -

Va. at 668). "In contrast, malice implied by conduct, i.e., implied malice, exists where a defendant lacks the deliberate intent to kill, but the circumstances of the defendant's actions are 'so harmful that the law punishes the act as though malice did in fact exist.'" *Id.* (quoting *Pugh*, 223 Va. at 668). Indeed, "implied malice does not require that a defendant have a deliberate intent to kill. Rather, it is the fact that the defendant 'willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm.'" *Id.* at 256-57 (quoting *Essex*, 228 Va. at 280-81). Furthermore, "malice may be implied from the deliberate use of a deadly weapon." *Id.* at 256 (quoting *Smith v. Commonwealth*, 239 Va. 243, 264 (1990)). *See also Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994) ("Taking the steps necessary to locate and obtain a weapon further bolsters the inference of malice.").

"Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Palmer v. Commonwealth*, 71 Va. App. 225, 237 (2019) (quoting *Canipe*, 25 Va. App. at 642); *Pugh*, 223 Va. at 667 (stating that "whether a defendant acted with malice is generally a question to be decided by the trier of fact"). In determining whether a defendant acted with malice, "the fact-finder must be guided by the quality of the defendant's conduct, its likelihood of causing death or great bodily harm, and whether it was volitional or inadvertent." *Canipe*, 25 Va. App. at 642-43 (quoting *Essex*, 228 Va. at 282).

"To reduce a homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation." *Id.* at 643 (quoting *Barrett v. Commonwealth*, 231 Va. 102, 105-06 (1986)). "Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Id.* (quoting *Barrett*, 231 Va. at 106). "In order to show that a killing occurred in the heat of passion, the evidence must prove the simultaneous occurrence of both 'reasonable provocation' and 'passion.'" *Id.* (quoting *Martin v. Commonwealth*, 184 Va. 1009, 1016 (1946)). "Heat of

- 22 -

passion is determined by the nature and degree of the provocation and may be founded upon rage, fear, or a combination of both." *Id.* (quoting *Barrett*, 231 Va. at 106). "Generally, whether a killing was done in the heat of passion upon reasonable provocation is a question of fact." *Id.*

In this case, there was ample evidence to establish that Richard Brunk shot and killed his brother, Ronald Brunk, at his brother's workplace—and that he did so with malice. Investigator Kyle Dolph, who interviewed Brunk the same evening after the shooting, testified at trial that Brunk told the investigating officers that he had gone to his brother's workplace that day "to have a conversation with him about that warrant." Brunk explained to the officers that he parked his truck perpendicular against his brother's truck in order to prevent his brother from being able to leave his workplace and "to force that conversation with his brother." He went on to tell the officers that after confronting his brother in his brother's office and then engaging in a "physical altercation," he went back outside to his truck. At that point, Brunk grabbed his shotgun from his truck and then fired his shotgun through the "locked front door" of the building, striking his brother (who was inside the building behind the exterior glass door).[10] Investigator Dolph noted that Brunk "said a couple times that he had no regrets as far as what had happened."

Richard Brunk later admitted to three different individuals (Michael Eshbaugh, John Leber, and Jerry Buracker) at the Rockingham Regional Jail that he had shot his brother. Eshbaugh testified at trial that Brunk told him that after getting into a fight with his brother, he "left the building, went out to his truck and got a shotgun, [and] went back to the building." Eshbaugh also testified that Brunk then told him that after he saw his brother "go back in the

---

[10] Wesley Nolt (one of Ronald Brunk's employees) and Deputy Dakota Foster (the first officer to respond to the crime scene) both confirmed that the building's exterior glass door was locked when they arrived at the crime scene. In addition, the police found "small round metal pellets consistent with shotgun pellets" near Ronald Brunk's deceased body. Investigators Daniel Conley and Kyle Dolph later found a shotgun, one used shotgun shell casing, and evidence of blood in Richard Brunk's truck—as well as a bloody gray shirt and two boxes of shotgun shells in Brunk's residence.

building and lock the door," he "had the gun in the firing position and he just shot him." Leber similarly testified at trial that Brunk told him that after he and his brother "got to fighting," he then "went back to the truck and got the gun that was already loaded and went back to the building and shot his brother." When asked whether Brunk had expressed any remorse for shooting his brother, Leber stated, "No. He actually told me that 'I wanted to blow his fucking head off.' Excuse my French." In addition, Buracker testified at trial that Brunk told him that he had "picked out a .12 gauge pump shotgun and special turkey shot shells he was going to use. He said he was going to end it, end his brother taking things from him." Buracker also testified that Brunk then told him that after retrieving his shotgun, he saw "his brother coming through the door so he raised the gun up and he said there was a sight on the end of it that he knew his target was in sight so he shot through the door."

The trier of fact here could certainly infer malice from Brunk's deliberate use of his shotgun to shoot and kill his brother. *See Watson-Scott*, 298 Va. at 256 (stating that "malice may be implied from the deliberate use of a deadly weapon" (quoting *Smith*, 239 Va. at 264)). The trier of fact could also infer malice from Brunk's going back outside to his truck to retrieve his shotgun that he then used to shoot his brother through a locked glass door. *See Morris*, 17 Va. App. at 578 ("Taking the steps necessary to locate and obtain a weapon further bolsters the inference of malice."). In addition, Brunk's statements to the investigating officers and to several individuals in the Rockingham Regional Jail demonstrated a motive to kill his brother. *See Archie v. Commonwealth*, 14 Va. App. 684, 690 (1992) (recognizing that "although motive is not a necessary element . . ., 'it is relevant and often most persuasive upon the question of the actor's intent'" (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982))). Furthermore, the trier of fact could consider the sworn testimony from the witnesses noted *supra* about Brunk's apparent lack of remorse.

In short, the record before this Court on appeal supports a finding that Richard Brunk acted with malice when he used his shotgun to shoot and kill his brother, Ronald Brunk. Therefore, we certainly cannot say that the trial court erred in denying Brunk's motions to strike—or that the jury, as the trier of fact, was plainly wrong or without credible evidence in finding that Brunk committed second-degree murder and that he used a firearm in the commission of that murder.

## III. CONCLUSION

For all of the foregoing reasons, we affirm the trial court's judgment, and we uphold both of Brunk's convictions.

*Affirmed.*