COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges O'Brien, Malveaux and Frucci


JOHN QUINCY NEAL, III, A/K/A
  JOHN Q. A. NEAL, III

                                                MEMORANDUM OPINION[*]
v.        Record No. 1732-24-2                         PER CURIAM
                                                    OCTOBER 7, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Lee A. Harris, Jr., Judge

(Stephen A. Mutnick; Winslow, McCurry & MacCormac, PLLC, on
brief), for appellant.  Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Lauren C. Campbell, Assistant
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Henrico County convicted John Quincy Neal,

III, of first-degree murder, using a firearm in commission of murder, using a machine gun for a

crime of violence, and possessing a machine gun.[1]  On appeal, Neal argues that the evidence was

insufficient to support his convictions.  For the following reasons, we affirm the convictions.[2]

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The offense date for the first-degree murder, use of a firearm in commission of murder, and using a machine gun for a crime of violence convictions was May 15, 2023.  The offense date of the possession of a machine gun was June 15, 2023.  Neal was also indicted for possession or use of a machine gun for an offensive or aggressive purpose with an offense date of June 15, 2023, which the circuit court dismissed on Neal's motion to strike.  Neal was also indicted for conspiring with another to commit first-degree murder, but the charge was nolle prossed.

[2] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument."  *See* Code § 17.1-403(ii)(c); Rule 5A:27(c).

BACKGROUND[3]

On May 15, 2023, Henrico County police officers responded to a residential address. The officers entered the residence and found a woman, B.M., in a bedroom with noticeable head trauma.[4] B.M. was pronounced dead at the scene. The medical examiner concluded that she died of two gunshot wounds to the head. Stippling around one of the entrance wounds indicated that the gun was discharged less than ten feet away. Recovered projectile fragments from B.M.'s gunshot wounds were sent for further testing. A toxicology report revealed that B.M. had THC and its metabolites, cocaine and its metabolites, and anti-anxiety medications in her blood.

Officers found three bullets near B.M.'s body. Forensic examination determined that they were all fired from the same firearm. In a trash can in the en-suite bathroom, detectives found a plastic baggie, a straw, and a Natural Ice beer can. Detectives also found what was later determined to be cocaine in the bathroom ashtray.

Erika Smalls, B.M.'s daughter, met detectives outside her mother's home while officers investigated. Smalls gave detectives her phone and told them about an Instagram tattoo scam that she believed was involved in her mother's death. Smalls explained that she had contacted the Instagram account One Way Ink about tattoo sessions and had made a deposit for the sessions to the CashApp account "Nisemaj1222," but, when she went to the address given to get the tattoo, the building was boarded up. Smalls told B.M. about what happened on May 14, 2023. B.M. requested the One Way Ink Instagram account and CashApp account information.

---

[3] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[4] We use initials, rather than names, to protect the privacy of the victim.

Smalls and her mother texted for most of the evening while B.M. communicated with the One Way Ink account on Instagram messenger. Later that evening, B.M. informed Smalls that One Way Ink had agreed to come to B.M.'s residence.

At 1:56 a.m., B.M. texted Smalls that the tattoo guys were at her home, that they apologized, and that "[t]he young one was a liar." B.M. then sent Smalls photographs of two men and arranged to pick up Smalls at 11:00 a.m. so that Smalls could get tattooed. At 3:49 a.m. B.M. texted Smalls that she had "seen his work" and that "[i]t's him in the video." B.M. never picked up Smalls as planned or sent her another text.

An examination of B.M.'s Instagram accounts and her cellphone records revealed B.M. communicated with two phone numbers after midnight on May 15, 2023. The first phone number was associated with Neal, and the second phone number was associated with Montreal Robinson. Upon review of Neal's and Robinson's social media accounts, Neal and Robinson appeared to be in the photos B.M. had sent Smalls the night of her death.

On June 15, 2023, detectives arrested Neal, gave his *Miranda* warning,[5] and then interviewed him.[6] During the interview, Neal identified Robinson as his step-uncle and asserted that he did not know Robinson's phone number, how to contact him, or if he had any social media accounts. Neal recognized a picture of B.M. and stated that he had once dropped off Robinson at B.M.'s house. Neal claimed that he only went inside B.M.'s home to use the restroom before returning home without Robinson. Later in the interview, detectives showed Neal the pictures B.M. had sent Smalls. When asked if he had a gun in his waistband, Neal stated that it was his "FN firearm." He denied shooting B.M. or giving Robinson his gun that evening. Neal also denied knowledge of the CashApp account "Nisemaj1222."

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] The interview was recorded, and segments were played for the jury.

- 3 -

On June 15, 2023, detectives executed a search warrant at Neal's home. In the first bedroom, detectives found an employment application with Neal's name on it and a storage bin filled with male clothes. In a storage bin detectives located two handguns: a FN nine-millimeter pistol and a Glock 23 Gen 5 .40 caliber pistol. Both firearms were loaded.

Further examination of the Glock revealed that it had two serial numbers and the cover plate had been replaced with a modified cover plate. The modified cover plate protruded from the back of the firearm with a switch so that the firearm could be fired in either a fully automatic or semi-automatic manner. Firearm specialist Jamie Dizon noted that the modification would allow a shooter to "pull the trigger once and [the gun would] fire multiple shots until . . . the gun malfunctions, [the shooter] release[s] the trigger, or it's out of ammunition."

John Carter, the Henrico County Police firearms administrator, test fired the Glock.[7] During the test fire of the Glock, Carter noted that the switch was malfunctioning because the gun fired in fully automatic no matter in which direction the switch was positioned. When the Glock was determined to be fully automatic, Virginia State Police checked their database and verified that Neal was not the lawfully registered owner of the weapon, that Neal had not registered the firearm as an automatic weapon, and that the firearm was not registered as an automatic weapon.

Buccal swabs from both Neal and Robinson were collected and compared with the DNA profiles that had been developed as result of a physical evidence recovery kit (PERK) prepared during B.M.'s autopsy. Testing determined that Robinson could not be eliminated as a contributor to the DNA profiles in the sperm fraction developed from the vaginal cervical sample, the anal rectal sample, the breast sample, or the vulvar perineal sample. Neal, however,

---

[7] Carter videotaped his test firing of the Glock, and the recording was shown to the jury.

could be eliminated as a contributor to the DNA profiles in the sperm fraction, the anal rectal sample, the breast sample, and the vulvar perineal sample.

Neal's and Robinson's buccal swabs were also compared with the DNA mixture profile developed on the recovered Glock. Neal could not be eliminated as a major contributor to the DNA profile on the recovered Glock. B.M. and Robinson were eliminated as a major contributor to the DNA profile on the Glock. Although a minor contributor was developed, the information was insufficient for comparison. Additionally, the fragments the medical examiner recovered during B.M.'s autopsy were determined to have been fired from the recovered Glock.

At trial, Niya Allston testified that Neal, whom she knew as "Jay," was her boyfriend in May 2023. Allston had met Neal through his Instagram account One Way Ink. After dating for two months, Allston provided her CashApp account, Nisemaj1222, to Neal. People would send Allston money via CashApp and then she would send half to Neal's CashApp "Gen Five." Allston never knew when people were going to send her money and noted that this arrangement occurred four or five times. Allston agreed to this scheme because Neal was going to help her with her two children.

Records from Allston's CashApp account illustrated that between May 13 and 14, 2023, there were two transactions of $100 and $35 from Smalls's CashApp account to Allston's CashApp account. Within minutes of each of these transactions, Allston's CashApp account transferred $80 and then $20 to Neal's CashApp account. At 5:57 a.m. on May 15, 2023, B.M.'s CashApp account attempted to transfer $50 to Allston's CashApp account. During this period, B.M.'s phone was no longer near her home, and Neal's phone was in the general vicinity of B.M.'s phone.

At trial, Robinson testified that on May 14, 2023, Neal invited him to "party" with a girl and instructed him to bring cocaine.[8]  Later that evening, Neal picked up Robinson, and the pair traveled to B.M.'s home.  After arriving, the trio went to a back bedroom where B.M. confronted Neal about a tattoo scam.  At the time, Robinson knew nothing about a tattoo scam, but Neal appeared to.  To defuse the situation and "keep the party going," Robinson offered to do the tattoo for B.M.  Robinson noted that he had tattooed before, had a tattoo kit, and would arrange for a tattoo kit to be brought to B.M.'s home.  B.M. provided Robinson her phone number; Robinson called B.M.'s number which went to voicemail.  The phone call occurred at 1:22 a.m.  Satisfied, B.M. and Robinson began drinking alcohol and snorting cocaine while Neal smoked marijuana.  Robinson drank a Natural Ice beer.

At 1:50 a.m. and again at 2:37 a.m., Robinson texted his friend "Duck"[9] and attempted to get Duck to come to B.M.'s home with a tattoo kit.  Sometime in the evening, Neal left the bedroom and Robinson and B.M. had sex.  Robinson was unsure where Neal went during this time.

At 3:05 a.m. Neal texted Robinson, "can't stay w her. . . . I'll smoke her RN . . . we do not have a kit."  In response, Robinson texted, "let me fuck her first."  Neal replied, "Go ahead."  When asked at trial what "smoke her" meant, Robinson asserted that Neal was going to hurt B.M. because they did not have a tattoo kit.

At 3:47 a.m., Robinson attempted to reach Duck again.  At 3:49 a.m. Robinson texted Neal and stated "I'm gonna leave," that "Duck . . . he coming send me the addy."  In response, Neal sent Robinson B.M.'s address.  At 3:59 a.m., Neal texted Robinson "tell em come asap.  U

_____

[8] Robinson admitted that he was a felon.

[9] Duck's legal name was not disclosed at trial.  Throughout the trial, Duck was referred to as Goose.

don't go the tattoo kit, u needa swerve." Robinson stated that Duck had the tattoo kit. In response, Neal asked "So u gon do the jawn." Robinson did not reply until 5:42 a.m. and told Neal "U might have to up on her fr." Robinson explained that he meant Neal might have to give B.M. her money back. Robinson admitted that he was alone with B.M. between 3:00 a.m. and 5:40 a.m. but denied shooting B.M.

At some point, Neal returned to B.M.'s bedroom. Robinson arranged to go to the store for beer and cigarettes and then went to the en-suite bathroom. While using the bathroom, Robinson heard gunshots. When Robinson exited the bathroom, he saw Neal with a gun. Robinson fled to Neal's car and called Duck and another friend to arrange transportation, but neither answered. Robinson did not remember how long he waited for Neal in the car and admitted he did not call the police because he was scared. When Neal returned to the car, he said nothing. As Neal drove away from B.M.'s home, Robinson asked Neal "what was that" but Neal did not respond. Neal drove Robinson to his house, and Robinson went to his nephew's, Mison Robinson's (Mison), room.

On cross-examination, Robinson admitted that during a police interview he had stated that Neal's "smoke her" message meant that Neal wanted to have sex with B.M. rather than to do B.M. harm. Robinson denied he paid B.M. for sex with U.S. currency or cocaine, denied that he argued with B.M. that morning, and denied that he had a gun that evening.

Neal's half-brother, Mison, testified that he and Neal lived together with a handful of people. In the early morning on May 15, 2023, Neal came home with Robinson. Robinson was "very frantic," "very panicked," and said, "he had to go." Robinson then asked Mison for a pair of clothes, which Mison provided. Once changed, Robinson took the clothes he had been wearing to the backyard and burned them in the grill. Mison never saw Robinson or Neal with a

gun that morning but did see Robinson go into Neal's bedroom. Mison was unsure how long Robinson was at his residence that morning because he went back to sleep.

On cross-examination, Mison indicated that he knew that guns were present in the house but had never seen Neal with a Glock that has a switch on it. The Commonwealth then impeached Mison with a picture taken from one of Mison's rap videos that showed Neal holding a gun that appeared to be the murder weapon. Mison also admitted that during the execution of the search warrant he did not tell police officers about Robinson burning clothes in the grill.

While testifying in his own defense, Neal admitted that he was the administrator of the One Way Ink Instagram account, that he was not a tattoo artist, and that he had received money from Smalls for a tattoo he did not provide. After B.M. confronted him, Neal apologized because he "wanted to make things right." He and Robinson planned to tattoo Smalls the next morning with a tattoo kit that one of Robinson's friends would provide.

Sometime in the evening, Neal left B.M.'s room and went to his car so that Robinson and B.M. could have sex. While in the car he smoked marijuana, played on his phone, and took a nap. According to Neal, once he left B.M.'s home he never went back inside. Neal admitted that he sent the text message "I'll smoke her RN" to Robinson but explained that he meant "I'll fuck her right now." Neal admitted, however, that he did not have sex with B.M.

When Robinson came out of B.M.'s house, he walked quicker than normal and asserted he needed to go. While driving home, Neal claimed that he saw that Robinson had blood spatter on his pants. When they arrived home, Robinson changed his clothes before leaving. A few days later, Neal learned that Robinson had burned the clothes he had been wearing at B.M.'s house in the grill. Neal never saw Robinson with a weapon that morning but did see Robinson leave his bedroom. Neal admitted he never asked Robinson about what happened at B.M.'s because he was raised to mind his own business.

Neal admitted that firearms were found in his bedroom. He acknowledged that the FN firearm was his but denied ownership of the Glock itself. Concerning the rap video image, Neal asserted he did not know what type of gun was pictured and denied that the pictured firearm had a switch on it. Neal also denied shooting B.M. At the conclusion of all the evidence, the jury convicted Neal of the charges, and the circuit court sentenced him to 93 years of incarceration, with 50 years suspended. Neal appeals.

## ANALYSIS

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

I. First-Degree Murder

Neal argues that the Commonwealth failed to prove that a willful, deliberate, and premeditated killing occurred. Neal also contends that Robinson was inherently incredible and that the Commonwealth failed to disprove that Robinson could have been the one to kill B.M.

"Murder . . . by . . . willful, deliberate, and premeditated killing . . . is murder of the first degree . . . ." Code § 18.2-32. "To premeditate means to adopt a specific intent to kill, and that is what distinguishes first[-degree] and second-degree murder. The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). "[E]vidence showing that the premeditation was only slight or momentary is sufficient to sustain the conviction." *Jackson v Commonwealth*, 267 Va. 178, 204 (2004) (quoting *Green v. Commonwealth*, 266 Va. 81, 104 (2003)). "This is so because '[p]remeditation is an intent to kill that needs to exist only for a moment.'" *Id.* (alteration in original).

In determining whether premeditation existed, "the jury may properly consider the brutality of the attack, . . . whether more than one blow was struck, . . . and the defendant's lack of remorse and efforts to avoid detection." *Avent*, 279 Va. at 208 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)). Circumstances commonly associated with first-degree murder include shooting the victim "at close, and thus predictably fatal, range," *Jackson v. Virginia*, 443 U.S. 307, 325 (1979), firing a weapon more than once, *Chandler v. Commonwealth*, 249 Va. 270, 280 (1995), and the "deliberate use of a deadly weapon," *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994).

"Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). "In determining a defendant's intent, '[c]ircumstantial evidence is as competent and is

entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (alteration in original) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)).

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). Nevertheless, "[o]ur inquiry does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2015)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005) (citing *Hudson*, 265 Va. at 514). Where the Commonwealth relied on "circumstantial evidence to carry its burden of proof beyond a reasonable doubt, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence.'" *Moseley*, 293 Va. at 463 (quoting *Commonwealth v. Smith*, 259 Va. 780, 783 (2000)).

Viewing the evidence in the light most favorable to the Commonwealth, there was sufficient evidence for the jury to find that Neal committed a willful, deliberate, and premeditated killing. The evidence established that Neal drove to B.M.'s house with Robinson to "party." Upon arrival, B.M. confronted Neal about scamming Smalls using his One Way Ink Instagram account. To appease B.M., Robinson offered to tattoo Smalls later that morning. At some point, Neal left B.M. and Robinson alone so that they could have sex.

At 3:05 a.m., Neal texted Robinson "can't stay w her. . . . "I'll smoke her RN . . . we do not have a kit." Robinson interpreted that to mean Neal was going to hurt B.M. because they did not have a tattoo kit. In response, Robinson asked Neal if he could have sex with B.M. first. Neal

acquiesced. After Robinson and B.M. had sex, Neal returned to B.M.'s bedroom. Robinson then left Neal and B.M. alone to use the en-suite bathroom. While in the bathroom, Robinson heard gunshots. When Robinson exited the bathroom, he saw Neal holding a firearm. After the shooting, Neal drove Robinson and himself to his home.

B.M.'s body was discovered in the back bedroom with an en-suite bathroom. The medical examiner concluded that B.M. was shot twice in the head at close range. When Neal was arrested, detectives recovered a Glock with a switch on it and with Neal's DNA on it in a storage bin in Neal's room. Comparisons between the projectile fragments found during B.M.'s autopsy and the recovered Glock determined that the Glock was the murder weapon. Given the totality of the circumstances, a reasonable factfinder could conclude that Neal shot B.M. at close range with an automatic pistol and then hid the weapon in his room. *See Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) ("[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt, and thus of guilt itself." (alteration in original)).

While Neal testified that he did not shoot B.M., "[t]he sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299-300 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the

- 12 -

witnesses.'" *Id.* (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)).

"The 'reasonable hypothesis of innocence' concept is also well defined. The Commonwealth need exclude only reasonable hypotheses of innocence that 'flow from the evidence itself, and not from the imagination' of the defendant." *Kelley*, 69 Va. App. at 629 (quoting *Pijor*, 294 Va. at 512). "It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (alteration in original).

"[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Id.* (alteration in original) (quoting *Haskins*, 44 Va. App. at 9). "While a factfinder may not arbitrarily disregard a reasonable doubt, whether 'the hypothesis of

innocence is reasonable is itself a "question of fact," subject to deferential appellate review.'" *Burton v. Commonwealth*, 58 Va. App. 274, 285-86 (2011) (quoting *Clanton v. Commonwealth*, 53 Va. App. 561, 572-73 (2009) (en banc)).

As such, how to credit Neal's or Robinson's testimony was a question for the jury to consider. By finding Neal guilty of first-degree murder, the jury considered but rejected Neal's hypothesis—that Robinson was the perpetrator—and instead concluded that Robinson was credible. As previously described, Robinson's testimony was also corroborated by other evidence. Neal points to nothing in the record that renders Robinson's testimony "so manifestly false" that it could not be believed, nor was his testimony "shown to be false" by evidence on which reasonable persons could not differ. Considering the totality of circumstances, a reasonable factfinder could conclude that Neal shot B.M. Furthermore, the evidence at trial was sufficient for the jury to conclude beyond a reasonable doubt that Neal willfully and deliberately killed B.M. with premeditation.[10]

II. Possession of a Machine Gun

Finally, Neal also argues that the evidence was insufficient to prove he possessed the Glock found in a storage bin on June 15, 2023. It is "[u]nlawful [to] possess[] or use . . . a machine gun for an offensive or aggressive purpose." Code § 18.2-290. A "machine gun" is "any weapon which shoots or is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." Code § 18.2-288(1). "A conviction for the unlawful possession of a firearm can be supported exclusively by evidence of constructive possession; evidence of actual possession is not necessary." *Bolden v. Commonwealth*, 275 Va.

---

[10] As Neal claimed the evidence was insufficient to support the first-degree murder conviction, Neal contends that the evidence is therefore also insufficient to support both his use of a firearm in the commission of murder and use of a machine gun for a crime of violence convictions. As a reasonable factfinder could conclude that Neal committed first-degree murder, the evidence is also sufficient to sustain those firearm charges.

144, 148 (2008). To prove that Neal constructively possessed a firearm, "the Commonwealth must present evidence of acts, statements, or conduct by [Neal] or other facts and circumstances proving that [he] was aware of the presence and character of the firearm and that the firearm was subject to his dominion and control." *Id.* (quoting *Rawls v. Commonwealth*, 272 Va. 334, 349 (2006)).

Constructive possession may be proved purely by circumstantial evidence. "[I]t 'is axiomatic that any fact that can be proved by direct evidence may be proved by circumstantial evidence.'" *Haskins*, 44 Va. App. at 6 (quoting *Etherton v. Doe*, 268 Va. 209, 212-13 (2004)). "[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing." *Pijor*, 294 Va. at 512 (alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "While no single piece of [circumstantial] evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc) (alteration in original) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)). The "accumulation of various facts and inferences, each mounting upon the others," may constitute sufficient evidence to sustain a conviction. *Id.*

Here, it is undisputed that the Glock found in Neal's bedroom meets the statutory definition of a machine gun. Neal admitted that the Glock was found in his bedroom on his clothes. Although Neal denied ownership of the Glock, his DNA was on the Glock and he admitted to owning the other items that were with the Glock. Additionally, Neal was pictured with the apparent Glock in a rap video. "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011)

(quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). Whether to believe Neal's testimony was a question of fact for the jury. By finding him guilty, the jury chose to disbelieve Neal's self-serving testimony and instead conclude that the Glock was his and he knew it was in a storage bin in his room. Looking at the evidence in the light most favorably to the Commonwealth, a reasonable factfinder could conclude beyond a reasonable double that Neal knew that the Glock was in the storage bin in his room, that it was subject to his dominion and control, and that he was guilty of constructively possessing a machine gun.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*